**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     Plaintiff, | |
|     v. | Criminal Action No. 1:08-cr-00032-TFH |
| WILLIAM MICHAEL DULANY, | 1:07-mj-00673-JMF |
|     Defendant. | |

## WILLIAM DULANY SENTENCING MEMORANDUM

Defendant William Michael Dulany, by counsel, submits this Memorandum for consideration for his sentencing scheduled for June 9, 2008. Mr. Dulany states as follows:

### I.  INTRODUCTION

On February 2, 2008, William Dulany, an intelligent, recently married man with a bright future, pled guilty to a single count of Enticing a Child, 22 DC Code § 3010(b). This plea was the result of Mr. Dulany making the biggest mistake of his life by attempting to enter the District of Columbia to have sex with a minor. Mr. Dulany understands that his actions were not only illegal but abhorrent. He has fully accepted responsibility for his actions. Mr. Dulany also realizes that he has an addiction that needs to be cured; an addiction that caused him to commit the very serious crime mentioned above.

However, now that he has been arrested and the issues are out in the open, Mr. Dulany hopes to move forward with his life. He has begun treatment by undergoing a psychosexual evaluation, seeking counseling from specialists in the treatment of sexual addictions, and attending faith-based counseling programs. We urge this Court to sentence Mr. Dulany in a

manner that will allow him to continue to receive the treatment that he needs, continue to pursue his career goals and rebuild his family. Mr. Dulany does not need to be incarcerated. He needs to be professionally treated so he can move forward and lead a productive and prosperous life. We respectfully submit to this Court that a sentence of home confinement or probation would be reasonable.

## II.    STATEMENT OF FACTS

### A.    The Offense

On December 20, 2007, Mr. Dulany engaged in a conversation with an associate he had met over the internet. In this conversation, he accepted an invitation to meet with the associate and an individual that Mr. Dulany believed to be a 14-year old boy. That evening, Mr. Dulany traveled into the District of Columbia to meet the associate and minor with the intention of engaging in a sexual act with the minor. However, upon arriving at the agreed upon location, the authorities promptly arrested Mr. Dulany, as they had, in fact, used the aforementioned associate to set up this meeting. Mr. Dulany was taken into custody. He immediately waived his Fifth Amendment privilege against self-incrimination and gave a complete statement outlining how the events that lead to his arrest transpired. He was completely truthful with the authorities at that time and has accepted full responsibility for his actions.[1]

On February 28, 2008, pursuant to a plea agreement with the United States, Mr. Dulany pled guilty to a single count of Enticing a Minor, 22 DC Code § 3010(b).

### B.    Mr. Dulany's Personal History and Characteristics

Mr. Dulany is a 25-year old from suburban Maryland. He was raised in a middle class home with his parents, his brother and his sister. Mr. Dulany's upbringing was as normal of an

---

[1] The Presentence Investigation Report and Addendum ("Report") and the Information outline the conduct at issue in detail. Both provide accurate descriptions of the conduct if more detail is needed.

upbringing as one can imagine. He played soccer as a youth, participated in his church's various youth programs, and attended the local public schools where he was valedictorian for his senior class. Upon graduation from high school, Mr. Dulany enrolled in the University of Maryland where he was accepted into the Honors Program. He went on to graduate with honors with a Bachelor of Science in Marketing. Mr. Dulany was pursuing his Masters Degree in Business Administration at the time of his arrest and is currently enrolled in one class which will end August 15, 2008. If there are no interruptions, he intends to complete his degree requirements in the Fall of 2009.

After college, Mr. Dulany began a career in marketing. Mr. Dulany was employed full time as a Marketing Specialist until March 2008 when he was forced to resign because of his actions leading to his arrest. Mr. Dulany currently works part-time in a similar capacity for another small Maryland company. Mr. Dulany enjoys his marketing work and continues to interview for full-time, more stable employment in the field. One potential long term employer, upon learning of Mr. Dulany's arrest and pending sentencing, contacted Mr. Dulany's counsel to find out more information and indicated that he would await the outcome of sentencing before making any decisions regarding whether to hire him.

In 2007, Mr. Dulany married Sarah Phelan (now Sarah Dulany). Until his arrest, they resided in Frederick, Maryland in a newly purchased home that they were refurbishing together. Because of the current circumstances, the Dulanys now are legally separated but are working on their relationship.

Although Mr. Dulany has been fortunate to have a strong, loving family and to excel in a career that he enjoys, his life has not been perfect. During the past two years, Mr. Dulany's life has been filled with challenging events that simply fueled his addiction. These are not provided

to the Court as excuses for his behavior, but they do put his life in perspective.  In July 2006, Mr. Dulany's father, Bryant Dulany, donated a kidney to Mr. Dulany's younger brother, Brandon Dulany.  Brandon has suffered from kidney disease since age three.  This transplant should be effective for the next fifteen years of Brandon's life.  After that, Mr. Dulany has agreed to donate a kidney to his brother to get him through an additional fifteen years.  In December 2007, Mr. Dulany had his own health scare when he was diagnosed with skin cancer and underwent minor surgery to have it removed.  Mr. Dulany now sees a specialist every 3-6 months to be tested for reoccurrence.  While this may seem like a minor event, learning of his cancer was a shock to an otherwise healthy and active young man.  On July 14, 2008, two weeks after his marriage, Mr. Dulany was swimming with his sister's boyfriend, Jaron Putmon when he died in a tragic drowning accident during a family trip to Ohio.  As stated above, these events are not provided as excuses.  However, these events undoubtedly contributed to the bad decisions that now bring Mr. Dulany before this Court.

## III.    A REASONABLE SENTENCE

Pursuant to 24 D.C. Code § 403.01, the sentence imposed by the Court should:

(1) Reflects the seriousness of the offense and the criminal history of the offender;

(2) Provides for just punishment and affords adequate deterrence to potential criminal conduct of the offender and others; and

(3) Provides the offender with needed educational or vocational training, medical care, and other correctional treatment.

24 D.C. Code § 403.01(a).

As discussed in more detail below, a sentence for home confinement or probation is an appropriate sentence.  Mr. Dulany deeply regrets his actions and takes full responsibility for the

hurt and embarrassment he has caused his family.[2]  Mr. Dulany has informed his friends and family of his crime and his problem in order to lead a more honest life.  While most of the people he told have been supportive of Mr. Dulany, these were not easy conversations to have. However, Mr. Dulany believed he needed to inform people of what he had done to accept responsibility for his actions and move forward with his life.  These actions show that Mr. Dulany is taking the proper steps to insure that these types of transgressions never occur again.

We ask that Mr. Dulany be given a chance to continue his current efforts to put his life back together.  He has lost his job.  His marriage clearly has suffered and he is working to repair it.  If it were not for his loving, understanding wife, Mr. Dulany would have already lost his marriage.  He certainly has suffered as a consequence of his actions.  Incarcerating Mr. Dulany to punish is not necessary.  Both home confinement and probation are within the sentencing guidelines and reflect the seriousness of Mr. Dulany's crime.  Home confinement or probation, however, unlike a prison term, will allow Mr. Dulany to continue with his plan of treatment, education, and career pursuits.  Allowing Mr. Dulany to avoid incarceration squarely satisfies the reasonability test set forth in the D.C. Code.

A.    **The Applicable Guideline Calculation**

Mr. Dulany pled guilty to 22 DC Code § 3010(b) which is classified as a Group 8 felony. Mr. Dulany has no previous criminal history either as a juvenile or an adult.  Report, at ¶¶ 17-18. Pursuant to the District of Columbia Voluntary Sentencing Guidelines ("DCVSG"), Mr. Dulany's criminal history score is 0 and, therefore, falls within Category A.  The parties are in agreement that applicable sentencing guideline calculation is 6 to 24 months incarceration and that both a split sentence and sentence of probation are both permissible within this range.

---

[2] A copy of a letter Mr. Dulany wrote to himself detailing his feelings since his arrest is attached hereto as Exhibit A.

**B.**    **Treatment**

Mr. Dulany accepts that he has a problem with sexual addiction.  Prior to the incident,

Mr. Dulany sought help through counseling with Mary K. Holzinger, LCSW-C, CEAP.  Mr.

Dulany had regular sessions with Ms. Holzinger from December 2005 to September 2007.

Although Mr. Dulany raised some of the issues he was experiencing with Ms. Holzinger, he did

not fully disclose the full extent of his problems.  Mr. Dulany improperly thought he could work

through his problems and issues without in depth professional help.  In addition, Mr. Dulany did

not seek out the support of his family or incorporate faith based treatment into his counsel.  Mr.

Dulany now knows that for counseling to work, it must be much more thorough and aggressive.

Since his arrest, with the assistance of his family, Mr. Dulany has developed a thorough

and aggressive Wellness Plan that includes a variety of different types of counseling.  Initially, to

determine the scope and severity of his issues, Mr. Dulany engaged Dennis R. Carpenter, Psy.D.,

a licensed clinical psychologist who specializes in sex offender treatment.  Dr. Carpenter

conducted an evaluation of Mr. Dulany based on his interviews and testing of Mr. Dulany,

interviews with Mr. Dulany's family and Ms. Holzinger, and his review of information from this

case.[3]  Dr. Carpenter made several observations regarding Mr. Dulany and ultimately concluded

that Mr. Dulany is someone who wants help for his problems, is motivated for treatment, can be

safely treated in the community, and has a very good prognosis for successful treatment.

In order to find the "successful treatment" option, Mr. Dulany and his family have done

extensive research.  They have contacted over twenty health care providers and facilities to find

the best treatment options for Mr. Dulany.   Beginning in early February, Mr. Dulany engaged

the services of Dr. Joseph G. Poirier, a Clinical Psychologist Board Certified in Clinical

---

[3] A copy of Dr. Carpenter's Psychosexual Evaluation Report and Dr. Carpenter's Curriculum Vitae has been filed under seal with the Court as Exhibit B.

Psychology, Forensic Psychology and Family Psychology.[4]  Mr. Dulany had has six sessions with Dr. Poirier.  As additional reinforcement, Mr. Dulany attends weekly Sexaholics Anonymous Meetings in Walkersville, Maryland.  Mr. Dulany also has sought couples therapy with his wife.  All of the counseling efforts are ongoing and will continue as long as possible.

Another important element of Mr. Dulany's Wellness Plan includes faith-based counseling.  He has sought treatment with Kevin Schick, M.A., L.C.P.C., N.C.C., Director of Counseling for Fourth Presbyterian Church and has participated in more than fifteen counseling sessions.  Similar to Dr. Carpenter, Mr. Schick found that Mr. Dulany had a strong desire to change.  Mr. Schick conducted psychological testing on Mr. Dulany and found that Mr. Dulany had a low on risk assessments indicating a very low risk of reoffense.[5]

Additionally, Mr. Dulany attends biweekly counseling sessions with Frederick B. Winston, M.P.C., M.S., a licensed Pastoral Counselor and Adjunct Professor at Hood College.  Mr. Winston's counseling is more informal than that of Dr. Poirier and Mr. Schick but no less effective.  Mr. Dulany has participated in more than ten sessions with Mr. Winston, some of which included other family members.[6]

On February 8-10, 2008, Mr. Dulany attended New Life Ministries' Every Man's Battle Conference focusing on sexual integrity.  From this Conference, which was held in Sterling, Virginia, Mr. Dulany gained not only insight into how to cope with some of his issues.  He also found an accountability partner with whom he keeps in regular contact for advice and support.[7]

As part of his Wellness Program, Mr. Dulany also has begun an exercise regime, improved his diet, regularly attends worship services at St. James' Episcopal Church, and listens

---

[4] A copy of Dr. Poirier's Curriculum Vitae is attached hereto as Exhibit C.
[5] A copy of the Kevin Schick Letter has been filed with the Court under seal as Exhibit D.
[6] See Frederick B. Winston Letter attached hereto as Exhibit E.

to radio broadcasts of the teachings of Dr. Charles Stanley of In Touch Ministries.

Moreover, during this entire ordeal, Mr. Dulany's family has helped him move towards full recovery. Now that they are aware of his problem, they openly discuss it and provide additional levels of support. Clearly, and fortunately, Mr. Dulany is in a situation that makes recovery more likely. With the treatment outlined above, Mr. Dulany believes that he is making progress towards identifying and addressing his issues to move forward.

## C.  **Incarceration is not necessary**

Incarcerating Mr. Dulany would hinder his recovery. Mr. Dulany is a good, responsible person who can contribute greatly to his family and society at large. His positive standing in the community is evidenced by the fifteen character letters submitted on his behalf. His friends and community members refer to Mr. Dulany as a hard worker, responsible, compassionate, respectful; an overall "decent human being."[8] Based on their conversations with Mr. Dulany, they believe that he is remorseful and takes full responsibility for his actions.[9] They do not believe that Mr. Dulany "is in [any] way a threat to society."[10]

Mr. Dulany has a problem with sexual addiction that was compounded by the personal and tragic challenges that he has had to face over a relatively compact period. Mr. Dulany understands that he acted in a reprehensible and inappropriate way that has damaged himself, his family and could have potentially damaged the life of a minor. He takes full responsibility for his actions and asks the Court for an opportunity to seek appropriate treatment; treatment that he will be unable to receive if he is incarcerated.

---

[7] An accountability partner is similar to a "sponsor" that one would have if he attended an Alcoholics Anonymous meeting.
[8] See Amanda R. Elder Letter attached hereto as Exhibit F; Hamilton Easter Letter attached hereto as Exhibit G
[9] See Ron Abigill Letter attached hereto as Exhibit H; Joan Fader Letter attached hereto as Exhibit I; Kellan Webb Letter attached hereto as Exhibit J.
[10] Narda Ipakchi Letter attached hereto as Exhibit K.

Mr. Dulany's post arrest actions warrant careful consideration of a sentence of probation or other supervised release. At every stage in this process since his arrest on December 20, 2007, Mr. Dulany has fully cooperated and taken full responsibility for his actions. After his arrest, Mr. Dulany voluntarily agreed to waive his Fifth Amendment rights and be interviewed by the arresting officer, Detective Timothy Palchak. Mr. Dulany fully and completely answered all of Detective Palchak's questions. Additionally, after the preliminary hearing on January 8, 2008, Mr. Dulany met with the Assistant United State's Attorney and Detective Palchak and provided them with information on other individuals that were possible concerns to law enforcement. Mr. Dulany, however, did not have any significant information to give because of his peripheral role and limited involvement in any other serious crimes. Detective Palchak indicated that Mr. Dulany's cooperation and attempts to assist would be noted to the Court. As succinctly stated by Mr. Penders in the Report, "Mr. Dulany has been more than cooperative." Report at, p. 13.

Another indication of Mr. Dulany's suitability for home confinement or probation is the fact that Mr. Dulany has been living under similar conditions with no problems since his arrest. Mr. Dulany was released under the auspices of the D.C. Pretrial Services High Intensity Supervision Program. In the almost six months since his arrest, Mr. Dulany has demonstrated that he follows directions, meets deadlines, regularly meets with his probation officer and otherwise operates appropriately under a home confinement structure.

In addition to the obvious benefit of allowing Mr. Dulany to follow his on-going plan of treatment in an uninterrupted manner, a sentence of home confinement or probation would also permit Mr. Dulany to give back to his community in ways that he would be unable to do if incarcerated. Mr. Dulany has the potential to be a positive force in the community. He is working with Mr. Winston to set up a men's Bible study group through his church. Additionally,

although he is still developing the idea, Mr. Dulany desires to use his experiences to help others who have similar issues. Towards this end, if permitted, Mr. Dulany would like to participate in an "alumni" group comprised of the individuals who participated in the Every Man's Battle Conference described above. Mr. Dulany's enterprise, as he would have if conceived, would help those who have been charged with similar crimes to find jobs, appropriate counseling and provide a support structure. Mr. Dulany is committed to finding something positive to take away from this episode in his life and strongly desires the opportunity to help other young men with addiction. These outreach efforts would have positive effects on Mr. Dulany's community.

Finally, and perhaps most importantly, as stated above, Mr. Dulany has a family support structure made up of his wife, parents and siblings, aunts and uncles, all of whom stand by him and assist him with his issues. As noted by Mr. Penders, Mr. Dulany's parents "have not wavered in their support for Mr. Dulany" and have agreed to "continue to assist and support their son." Report at ¶ 24. In a letter submitted to the Court, Mr. Dulany's father states, "As our first child Bill has been a great joy and blessing for my wife and I. We are committed to helping him attain good psychological health and monitoring it to prevent any recurrence."[11] Sarah Dulany, Mr. Dulany's wife, recognizing that Mr. Dulany is a good person who needs treatment, has forgiven him and notes "I am so grateful that this has happened, no matter how much it hurts."[12] Once concern with incarcerating Mr. Dulany is that it may retard the progress that Mr. Dulany has made since his arrest and may prevent him from moving forward as he could otherwise.

---

[11] W. Bryant Dulany Letter attached as Exhibit L. *See also* Karen Dulany Letter attached hereto as Exhibit M; Brandon Dulany Letter attached hereto as Exhibit N; Kathryn Dulany Letter attached hereto as Exhibit O; Robert Sefcik Letter attached hereto as Exhibit P; Linda M. Koltas Letter attached hereto as Exhibit Q.
[12] Sarah Dulany Letter attached hereto as Exhibit R.

D.    **Mr. Dulany's Plan for Rehabilitation**

Mr. Dulany has a focused plan for treatment and has demonstrated that he is an excellent candidate for a sentence of probation or home confinement.  Mr. Dulany plans to continue treatment including regular sessions with Dr. Poirier, and Counselors Winston and Schick.  Mr. Dulany also will continue to attend Sexaholic Anonymous meetings, and seek out faith based conferences.  For example, Mr. Dulany desires to attend the Healing is a Choice Conference in July sponsored by New Life Ministries.

Mr. Dulany also is exploring more intensive, in-patient treatment options later this year some of which are out of state.  Specifically, Mr. Dulany is considering treatment through Life Skills International of Aurora, Colorado and Keystone Center, The Residential Center for Healing from Sexual Compulsivity and Trauma in Chester, Pennsylvania.

Mr. Dulany has no objection should the Court make his treatment plan or any other treatment the Court feels necessary or appropriate a condition of a sentence of home confinement or probation.  In the interim, Mr. Dulany will continue with treatment, continue to work towards earning his M.B.A. and seek employment that will allow him to care for and repay his family.

IV.    **SUMMARY**

For the reasons stated above, William Michael Dulany respectfully requests that the Court impose a sentence of home confinement or probation.


Dated: June 4, 2008

Respectfully submitted,

   /s/
Roscoe C. Howard, Jr., D.C. Bar No. 246470
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004

(202) 274-2960
roscoe.howard@troutmansanders.com

*Counsel for William Michael Dulany*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this _____ day of March 2008, a true and accurate copy of the foregoing was served via the Court's electronic filing and service system to:

Opher Shweiki
U. S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Room 4233
Washington, DC 20530


_____/s/_____
Roscoe C. Howard, Jr., DC Bar No. 246470
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2960
roscoe.howard@troutmansanders.com

William Michael Dulany                                        June 3, 2008
6706 Manorly Court
Frederick, Maryland 21703

Honorable Judge Thomas Hogan:

     My name is William Michael Dulany. I am sorry and ashamed to say that I am the reason you are spending your valuable time and energy on this case. I would like to apologize, and express my thanks to you and this Court for taking the time to review all of my information. On December 20, 2007 I made one of the biggest mistakes of my life. Without thinking of the consequences of my decisions, for myself and others, I agreed to participate in an activity I knew to be illegal. I have clearly made some very poor choices and my reluctance to take the appropriate action to change led to the terrible decision I made that night. However, I know that despite all of the consequences of this decision, this will have a positive impact on my life. I am thankful for the way things have turned out so far, and know that had this not happened now, my decisions most likely would have become more and more detrimental to myself and the important people in my life.

     In trying to decide the best way to communicate my understanding of the situation, and the affect it has already had on my life, I felt that it would be best to share with you a letter I had already written. Early on, my father had recommended that I write myself a letter, one which I could re-read whenever I encountered difficult times in my recovery and life in general. This would act as a reminder for me moving forward and an aide for me in decision making.

     I trust in your experience and wisdom as a Judge, and believe in the laws of this country. I know that my actions, and my actions alone, have led to this day and the sentence you will give me. However, I want you to know I will endure this difficult time in my life, and use it to change mine and others' lives for the better. The following is the letter that I wrote to myself shortly after my arrest. I think it expresses my feelings more thoroughly than anything else, and so I am sharing it with you now.


A Letter to Myself:

     You were saved December 20, 2007. After years of giving in to selfish temptations, and promising God and yourself you would change "someday", your perception of good and bad, right and wrong, decayed enough for you to commit a sin worthy of arrest and prison. Your heart stopped when you realized your mistake and gave up your personal belongings to the police officers. You were handcuffed and driven to a detective's office. Your first thought was of Sarah, sitting at home, expecting you to walk through the door at any minute. Instead, you were shaking and sweating in the back of a police car.

     As you waited in the interrogation room you thought of Sarah, probably frantic and calling your cell phone. You knew that all of the wonderful times you had with her were over, all of the fun and exciting plans ahead were out of reach. You might never get to touch her, hold her, or kiss her again. Nothing you told her would be believable



anymore. She would be heartbroken and disgusted. You thought of the home you had together, the plans for making it your own with her, the children you talked about, and the vacations you would take with her. All of these things were gone because you decided to drive east rather than west one night.

Only this didn't happen because of one wrong decision. No matter what you decided that night, this was the outcome that was meant to take place. You did not seek the help you knew you needed. You told yourself that you could control your urges. Each time you broke your promise to God and yourself (and Sarah) you "knew" that it would not happen again. You said as soon as you had time, you would start visiting and talking to God again. You would volunteer and help others as soon as you had the time and money. You fooled yourself into thinking that you would change without any real effort or changes to your life.

God stepped in on December 20 to save you from yourself. The flames of sin that had ignited all those years ago had been burning up your soul and conscience. They ate away at your morals and what you knew to be good and right. What had started as "harmless experimentation" had taken over your life. You were crossing more and more boundaries you had set for yourself, until finally, you agreed to engage in an illegal act. It had become easy to lie to yourself and others. You rationalized things so that you wouldn't be overcome with guilt. You cared only about yourself. However, this was not God's plan for you. That night, God stepped in to extinguish the flames that consumed you. The ceiling of your world fell in, and despite the tragedy that took place, and damage it caused, the good parts of your heart and soul were salvaged.

Now you are digging through the damage, trying to uncover that saved piece of you. All around you are reminders of what you ruined. Your relationship with Sarah is almost completely destroyed. It is unclear whether or not this can be saved, and most likely, it will not. Only with God's help will it ever function again. In loosing Sarah you lose the person you love most. The one who truly cares for you and about you. You lose the home you had together, the good times shared, and those that had waited ahead of you. This, by far, was your greatest loss. Not only did you lose Sarah, but she lost the person that she loved and trusted. You ruined her marriage and her plans for her life that included you, not the pain and lies that you brought on her. She is the most important person in your life, and you caused more problems and sorrow for her than anyone else.

Still, there was more. Your family was damaged as well. Although they are still in tact, and supporting you, you've caused them a great deal of pain and disappointment. They feel they don't know their son/brother, grandson/nephew. They worry for your health and future. They're spending a great deal of time, money and effort to do all they can to help you. You know that your aunts and uncles and cousins may never see you the same again. Family reunions and holidays, which always meant so much to you, will never be the same. You've given up the trust others placed in you. You've brought embarrassment to your family and the people who have always stood behind you.

Looking through the damage you also see all of your own personal financial loss. You've lost the car you just paid off. At least $12,000 gone in one second. The home you've put everything into may be gone in a little, leaving you with no place to live. Your job could be gone in a couple weeks meaning no source of income and insurance. You realize trying to find a new job now will be near impossible, and you must share your criminal record with each potential employer. Even when you do get another job, all of your money will go towards bills, loans, and the expenses your parents are now covering for your legal fees. Already over $13,000 in the first month.

Yet, all of this may have to wait. Your immediate future is still uncertain. With an upcoming trial, you don't know when or how long you may be gone. Separated from Sarah, your family, your friends, and your freedom. Imprisoned with people who could harm you, physically, mentally and permanently. You have no idea where you may be sent, or how long you may be gone. At 25, your life could be put on hold for a few years. Years that you will never get back, all because you gave in just one more time.

All the while the mistakes you made before are still haunting you and your family. Your mom and aunts are receiving phone calls from a dangerous person who has been blackmailing you. You've put yourself and family in danger by the choices you've made. What will you do if he decides to come to your house, or make your information even more public? What will you do if he hurts your family? You have no control over the situation and can only hope he goes away.

You realize after you make it through the next few weeks with the trial, and then potentially months or years of prison, you will have to start digging through the rubble again. Aside from the huge financial burden you'll be under, and the difficulty in finding a job to help pay for them, you will be an outcast in society. The information on your arrest and the mistake you made will be public, and you will be known no matter where you move. If the worst happens, and Sarah leaves for good, finding another girlfriend or wife will be difficult. If you are ever able to meet someone you can love again, you will have to share with her your past. If by some chance she accepts you, and you decide to make a family, you can never be the dad you wanted to be. You will be known in your children's schools and by other parents. No one will trust you completely. Parents won't let their children come to play with yours. You cannot be the soccer coach or the dad that takes the kids camping. You gave that up because you wanted five minutes of "something new and exciting" one night in December. You traded five minutes for years and years of happiness and freedom. Five minutes that you would have hated and regretted and felt terrible for afterwards anyway.

Despite seeing all of the destruction around you, you know God is there with you. There are still solid foundations to rebuild on and hopeful blessings that seem to keep appearing. Although you were arrested because you went to meet with a minor, God allowed it to happen in a way where no one else would be hurt. Even while being arrested you had a sense of calm around you. You spent the night in jail, terrified and depressed, but you were untouched and unthreatened. Despite the nature of your crime, you were allowed to go home with your family. While others were sent back to prison

3

cells, you were sent home to spend Christmas and New Year's in the home you grew up in. You got to see the sunrise each morning and set at night. You ate meals with your family and continued to work and earn an income to help pay off some debts. Most importantly, you had the opportunity to see and talk to Sarah. Even after you had torn apart her heart and her life with your selfish decisions, she spoke to you and cried with you, and prayed with and for you. Over the days and weeks the blessings continued. God blessed you with a strong and able attorney and team. Where others may have court appointed representatives, your family helped you find an accomplished lawyer to help guide you through the process. Despite being unable to provide the detectives with any useful information, the prosecution offered a plea less than you could have even hoped for. God was at work here. With the change in charge came the opportunity for a lesser sentence. God also appointed you a judge your attorney knew to be fair and reasonable. Through prayer you know that God will continue to pour out his mercy on you through the judge and legal system. Your sentence will be fair and according to His will. God knows best and will be with you no matter what the result of the sentence.

With your immediate future still very unclear, you know that you cannot totally begin the healing process you need. However, you understand the need to make the situation right, and to thank God by not taking for granted the blessings he continues to give you. Your life must forever be changed. The counseling and support groups will be a part of your life from now on. You must recommit yourself to your faith, and be sure that it is a part of your daily life. Despite this tragedy, the flames of temptation will still appear in your life. Digging through the damage will take the rest of your life, and as you dig you may come across embers that, if you do not get rid of or extinguish, could cause the fire to start up again, and finish what you started. The rest of your life will be spent putting out these temptations and finding some way to help others to do the same. Where the Devil has meant this as an evil against you, something to destroy all you worked for; Sarah, your family, your friends, your career, your home, your freedoms; God has meant this for good. Because of this mistake, you will be a changed person. In just a few weeks you have already started moving closer to God than you have been in the last number of years. You appreciate all that you had, and the remains of your life. You know that God loves you and will guide you through this rough time for something better. In time, you will have healed enough to be in a position to help others that struggle in similar situations.

And all of this is what you must remember any time you may think, "just one more time". God already gave you "one more chance" over and over before stepping in and stopping you from sliding down that steep slope. Although you didn't deserve it, He let you try on your own and you failed. Now that He has saved you, "one more time" is like spitting in His face, and the faces of all those who have helped and prayed for you; Sarah, your family, her family, your church, your friends, your lawyers, the legal system of your country, and all those who suffer more than you, yet still find a way to lead good lives.

Five minutes can never compare to the joy you can experience for the rest of your life. Work to earn the blessings you have been given. Be the person God has created and

wants you to be.  Pray for the strength to make it through any difficult times and the clarity to hear God's word and direction for you.  You deserve to enjoy all the good things that you work hard achieve.


Sincerely,

William M. Dulany


Again, thank you very much for taking the time to listen to me.  Again, I am deeply sorry for what I have done and appreciate you spending the time to consider my case.

# FILED UNDER SEAL



CURRICULUM VITAE
of
**Joseph G. Poirier, PhD, ABPP**
966 Hungerford Drive
Jackson Place North
Suite 14-B
Rockville, Maryland 20850-1743

### CLINICAL FORENSIC PSYCHOLOGIST

**EDUCATION:**

1965 – 1970   Duquesne University, Pittsburgh PA, Ph. D., Clinical Psychology (APA approved as of 2001).

1968 – 1969   Doctoral Internship, APA approved, Walter Reed General Hospital, Washington, DC

1964 - 1965   Pre Doctoral Internship, Longview State Hospital, Cincinnati, OH

1963 – 1965   Xavier University, Cincinnati, OH; M. A., Clinical Psychology

1958 – 1963   Boston College, Chestnut Hill, MA; B. A., Psychology

**PROFESSIONAL CREDENTIALS:**

*Licensed Psychologist*, State of Maryland

*Registrant* - National Register of Health Service Providers in Psychology

*Board-Certified in Clinical Psychology*, American Board of Professional Psychology (ABPP) (1978)

*Board-Certified in Forensic Psychology*, American Board of Professional Psychology (ABPP) (1985)

*Board-Certified m Family Psychology*, American Board of Professional Psychology (ABPP) (1991)

*Fellow*, American Board of Professional Psychology, Academy of Clinical Psychology

*Fellow*, American Board of Professional Psychology, Academy of Family Psychology

*Fellow*, American Board of Professional Psychology, Academy of Forensic Psychology

*Fellow*, American Psychological Association, Division 12, Clinical

*Fellow*, American Psychological Association, Division 29, Psychotherapy

*Fellow*, American Psychological Association, Division 42, Independent Practice

*Distinguished Practitioner and Member*, National Academies of Practice, Washington, DC

**PROFESSIONAL CLINICAL EXPERIENCE:**

1971 - Present    *Independent Practitioner*, Clinical/Forensic Psychology, Rockville, MD.

1994 - 2003    *Clinical Director*, Child and Adolescent Forensic Evaluation Services (CAFES), Department of Health and Human Services, Montgomery County, MD.

EXHIBIT
C

| | |
|---|---|
| 1991 – 2000 | **Clinical Forensic Psychologist**, Contract Expert Witness, Maryland Department of Health and Mental Hygiene,   Board of Examiners in Psychology, Baltimore, MD. |
| 1992 - 1994 | **Clinical Psychology Consultant**, Parents and Children Together (PACT), Department of Addiction, Victim, and Mental Health Services, Montgomery County, MD |
| 1981 - Present | **Clinical Psychologist, Contract Forensic Clinician**, State of Maryland Department of Health and Mental Hygiene, Clifton T. Perkins Hospital Center, Forensic Services, Jessup, Maryland. Community Forensic **Pre-Trial Screening** Program for Prince George's County, Maryland, Circuit and District Courts. |
| 1989 - Present | **Clinical Psychologist, Contract Forensic Clinician**, State of Maryland Department of Health and Mental Hygiene. Clifton T. Perkins Hospital Center, Forensic Services, Jessup, Maryland.  Community Forensic **Pre-Trial Screening** Program for Montgomery County, Maryland, Circuit and District Courts. |
| 1989 – Present | **Clinical Psychologist, Contract Forensic Clinician**, State of Maryland Department of Health and Mental Hygiene. Clifton T. Perkins Hospital Center, Forensic Services, Jessup, Maryland, Community Forensic **Pre-Sentencing Evaluation** Program for Montgomery County, Maryland, Circuit and District Courts. |
| 1989 – Present | **Clinical Psychologist, Contract Forensic Clinician**, State of Maryland Department of Health and Mental Hygiene, Clifton T. Perkins Hospital Center, Forensic Services Jessup, Maryland. Community Forensic **Pre-Sentencing Evaluation** Program, for Prince George's County, Maryland, Circuit and District Courts. |
| 1997 – 2003 | **Clinical Director**, Juvenile Sexual Offenders Program (JSOP), Montgomery County, MD, Department of Health and Human Services, Rockville, MD. |
| 1977 – Present | **Clinical Forensic Psychology Consultant**, Maryland School for the Deaf, Columbia, MD, and Frederick, MD campuses. |
| 1970 – 2002 | **Clinical Co-Director**, Seventh Judicial Circuit of Maryland, Circuit Court Mental Hygiene Service Prince George's County, Upper Marlboro, MD. |
| 1983 - 1992 | **Clinical Director**, Special Evaluation and Diagnostic Services (SEDS), Montgomery County, MD, Department of Addiction, Victim, and Mental Health Services. |
| 1973 - 1983 | **Clinical Director**, Young Adult Counseling Program, Alternatives and Counseling Service, Montgomery County Health Department, Silver Spring, MD. |
| 1973 - 1975 | **Clinical Psychology Consultant**, Counseling Center, Gallaudet University, Washington, DC. |
| 1972 - 1975 | **Corporate Clinical Partner**, Associates in Training and Therapy, Bethesda, MD. |
| 1971 - 1973 | **Chief**, Alcohol and Drug Dependence Prevention/Rehabilitation Service, Walter Reed General Hospital, Washington, DC. |
| 1970 - 1973 | **Research Director**, Psychiatric Experimental Ward 108, Walter Reed General Hospital, Washington, DC. |

| | |
|---|---|
| 7/70 – 9/73 | **Clinical Director**, Psychology Outpatient Service, Walter Reed General Hospital, Washington, DC. |
| 1969 – 1970 | **Chief Psychologist**, Mental Hygiene Service, Womack Army Hospital, Fort Bragg, Fayetteville, NC. |
| 1967 – 1968 | **Clinical Psychology Associate**, Clinical Psychology Department, Woodville State Hospital, Carnegie PA. |
| 1966 | **Staff Psychologist**, Harmarville Rehabilitation Center, Harmarville, PA. |

## TEACHING EXPERIENCE

| | |
|---|---|
| 1973 – 2003 | **Teaching Faculty**, Montgomery County, MD Department of Health and Human Services. |
| 1976 – 1982 | **Clinical-Forensic Psychology Consultant**, Psychology Service, Walter Reed General Hospital, Washington, DC. |
| 1969 – 1970 | **Assistant Professor**, Psychology Department, North Carolina State University, Charlotte, NC. |
| 1967 – 1968 | **Psychology Instructor**, Child Development Program, Graduate School, University of Pittsburgh, PA. |
| 1965 – 1967 | **University Teaching Fellowship**, Duquesne University, Pittsburgh, PA. |
| 1964 – 1965 | **University Teaching Fellowship**, Xavier University, Cincinnati, OH. |

## PROFESSIONAL AFFILIATIONS

Fellow, American Psychological Association

Fellow, Maryland Psychological Association

Fellow, Division 42, Psychologists in Independent Practice, American Psychological Association, Washington, DC.

Fellow, Division 29, Psychotherapy, American Psychological Association. Washington, DC.

Member, Division 12, Society for Clinical Psychology, American Psychological Association. Washington, DC.

Member, Division 41, American Psychology-Law Society, American Psychological Association. Washington, DC.

Member, Division 43, Family Psychology, American Psychological Association. Washington, DC.

## MILITARY SERVICE

Honorable Discharge, Captain, U.S. Army, September 1973.

JGPoirier - CV          4

## ADDITIONAL INFORMATION

*Project Coordinator listee* in DSM-III interrater field trials, Montgomery County, MD Health Department. American Psychiatric Association (1980). Diagnostic and Statistical Manual of Mental Disorders (Third Edition)( DSM-III), p. 476.

*Distinguished Faculty Award,* Montgomery County, MD, Department of Health and Human Services, June 1997.

*Clinical Examination Coordinator,* Mid East Region, American Board of Professional Psychology (ABPP), American Board of Clinical Psychology, 1993 to 2002.

*Member, National Examination Committee,* American Board of Professional Psychology (ABPP), American Board of Clinical Psychology, 1993 to 1997.

*President,* American Board of Family Psychology, American Board of Professional Psychology, August 1994 to August 1996.

*Past-President,* American Board of Family Psychology, American Board of Professional Psychology, August 1996 to August 1999.

*Mid East Region Forensic Board Representative,* American Board of Professional Psychology, Mid East Regional Board, 1987 to June 1993.

*Mid East Region Family Board Representative,* American Board of Professional Psychology, Mid East Regional Board, 1987 to June 1993.

*Editorial Consultant, Psychotherapy in Private Practice Journal,* 1987 to 2002.

*Editorial Board Member, Journal of Psychotherapy in Independent Practice,* 2000 to 2002.

*Member, Board of Directors,* Mid East Region Representative, American Board of Professional Psychology (ABPP), Academy of Clinical Psychology, July 1993 to 2003.

*Member, Board of Directors,* American Board of Professional Psychology (ABPP), American Board of Family Psychology, 1991 to 1997.

*Meritorious Examiner Service Award,* American Board of Professional Psychology, Clinical Psychology, August 1991.

*Member, Board of Directors,* Academy of Clinical Psychology, September 1993.

*Secretary,* American Board of Professional Psychology, Academy of Clinical Psychology, January 2002 to January 2005.

*Meritorious Service Award,* American Board of Professional Psychology, Family Psychology, August 1991.

*Consulting Editor,* Pacific Institute for the Study of Conflict and Aggression, 1998-2007.

*Appointed Member,* Professional Advisory Board, Pacific Institute for the Study of Conflict and Aggression, Kamuela, HI, 2000 to 2007.

JGPoirier - CV          5

*Chair*, Continuing Education Committee, American Board of Professional Psychology, Academy of Clinical Psychology, July 1998 to January 2006.

---

JGPoirier - CV          6

CURRICULUM VITAE
of
**Joseph G. Poirier, PhD, ABPP**
966 Hungerford Drive
Jackson Place North
Suite 14-B
Rockville, Maryland 20850-1743

### Clinical Forensic Psychologist

**Papers, Publications, and Presentations**:

1. Poirier, J. G. (1966). Effects of prenatal stress on rat offspring simple and complex learning behavior. Unpublished Masters Thesis. Xavier University, Cincinnati, OR.

2. Poirier, J. G. (1970). A phenomenological-experimental investigation of behavior without awareness. (Doctoral dissertation, Duquesne University, Pittsburgh, P A). *Dissertation Abstracts International,* 1970, 31, 7021272 (University Microfilms No.70-21, 272).

3. Jones, F. D., & Poirier, J. G. (1971, May). Ward 108, a point economy system for character and behavior disordered soldiers. Exhibit presented at the American Psychiatric Convention, Washington, DC.

4. Poirier, J. G. (1971). An operant approach to character and behavior disorders in the military: Three model treatment programs. *Journal of Forensic Psychology,* 2, 30-39.

5. Poirier, J. G. (1971, November). The use of a behavioral model in the understanding and treatment of drug dependent behavior. Paper presented at the Mental Health Conference on Current Trends in the U.S. Army Medical Department, Denver, CO.

6. Poirier, J. G., & Jones, F. D. (1971). A group approach to drug dependence in the military that failed: Retrospect. *Military Medicine,* 141, 366-369.

7. Poirier, J. G. (1973, April). Laboratory in team building for military mental health professionals. Panel discussant, Annual U.S. Army Medical Department Health Conference, Denver, CO.

8. Poirier, J. G. (1973, December). Current developments for Army Medical Department Clinical Psychologists. Panel discussant, Annual Current Trends Conference for U.S. Army Psychologists, Fitzsimmons Hospital, Denver, CO.

9. Poirier, J. G. (1977, April). An extended experience of treating schizophrenic and personality disordered young adults conjointly in group psychotherapy. Paper presented at the 48th Annual Meeting of the Eastern Psychological Association, Boston, MA.

10. Jardin, R. P., & Poirier, J. G. (1978, March). Typical phases of multiple family group process with drug dependent adolescents and young adults. Paper presented at the National Drug Abuse Conference, Seattle, WA.

11. Ericson, C. B., & Poirier, J. G. (1981). A comparative review of the substance abusing young adult with *and* without family involvement: Rationale and findings. In E. Senay, *Unity for the 80's, Official Proceedings 1980 of the National Alcohol and Drug Coalition.* New York: Haworth Press.

12. Ericson, C. B., & Poirier, J. G. (1980). Field trial experience using DSM-III in a community-based substance abuse treatment program. In R. Faulkinberry, *Drug Problems of the 70's, Solutions for the 80's.* Lafayette, LA: Endac.

13. Poirier. J. G. (1980). Treatment strategies with schizophrenic young adults with substance abuse histories. In R. Faulkinberry, *Drug Problems of the 70's: Solutions for the 80's.* Lafayette, LA: Endac.

14. Poirier, J. G. (1980, April). Personality disorders and substance abuse diagnosis in DSMIII. Paper presented at the AMEDD Military Psychiatry Symposium, William Beaumont Army Medical Center, El Paso, TX.

15. Poirier, J. G. & Ericson, C. B. (1981). Intensive treatment approaches in working with the violently acting out substance abuser. In E. Senay, *Unity for the 80's, Official Proceedings 1980 of the National Alcohol and Drug Coalition.* New York, NY: Haworth Press.

16. Poirier, J. G., Ericson, C. B., Beroza, R., Sylvester, c., & Foley, T.P. (1980, September). The integration of a multiple treatment alternatives approach including traditional individual, peer group therapies, and family therapy with recreational and vocational alternatives therapy in the intense treatment of the substance abuser. Panel presentation at the National Drug Abuse Conference, Washington, DC.

17. Poirier, J. G. (1981, March). Diagnostic and treatment issues with emotionally disturbed, hearing impaired children and adolescents. Paper presented at the Annual AMEDD Military Psychiatry Conference, San Antonio, TX.

18. Poirier, J. G. (1981, March). Late adolescence: chrysalis period for normalcy, schizophrenic, personality disorder or borderline development. Paper presented at the Annual AMEDD Military Psychiatry Conference, San Antonio, TX.

19. Wichlacz, C. R., Jones, F. D., Poirier, J. G., & Stayer, S. J. (1981). *The application of a follow-up design in an experimental military operant conditioning program.* Document Number: ADA 101 211, Defense Technical Information Center, Alexandria, VA.

20. Poirier. J. G. (1983, February). Psychotherapy with the violent patient. Paper presented at the American Psychological Association, Divisions 29 and 42 Mid-Winter Convention, White Sulphur Springs, WV.

21. Poirier, J G. (1983, September). The clinical interactions of alcoholism, drug abuse, and mental illness. Keynote address presented at the Maryland Institute of Alcoholism and Drug Abuse Studies, Clinical Skills Conference, Ocean City, MD.

22. Poirier, J., G. (1983, September). Addictions and mental illness. Workshop presented at the Maryland Institute of Alcoholism and Drug Abuse Studies, Clinical Skills Conference, Ocean City, MD.

23. Poirier, J. G. (1984, March). Assumptions in the assessment and management of the dangerous juvenile offender. Paper presented the American Psychological Association, Divisions 29 and 42 Mid -Winter Convention, San Diego, CO.

24. Poirier, J. G. (1985, March). Guidelines for forensic work for the psychologist in private practice. Paper presented at the American Psychological Association, Divisions 29 and 42 Midwinter Convention Miami Beach, FL.

25. Poirier, J G., Krask. E., & Rosenkrantz, L. (1985, June). Child sexual abuse and the psychologist. Workshop presented at the Maryland Psychological Association Convention. Baltimore, MD: Johns Hopkins University.

26. Poirier, J. G. (1986, February). Workshop on child sexual abuse: assessment, reporting, intervention, and treatment strategies. Workshop presentation at the American Psychological Association, Divisions 29 and 42 Mid -Winter Convention, Las Vegas, NY.

27. Poirier, J. G. & Rosenkrantz, L. (1987, June). Domestic violence: Malpractice liability concerns and realistic intervention. Workshop presented at the Maryland Psychological Association Convention, Baltimore, MD: University of Maryland.

28. Poirier, J. G. (1987, February). Eleven years later: Liability concerns and realistic interventions with Tarasoff. Paper presented at the American Psychological Association, Divisions 29, 42, and 43 Mid Winter Convention. Scottsdale, AZ.

29. Poirier, J. G. (1988, March). Issues in law and mental health. Workshop presented at Montgomery County, Maryland Department of Addiction Victims and Mental Health Services, In-service Training, Rockville. MD.

30. Poirier, J. G. (1988, June). Diagnostic and treatment issues with the juvenile sexual offender. Workshop presented by the Montgomery County, Maryland, Department of Addiction Victim and Mental Health Services and the Division of Services. for Victims and Families. Rockville, MD.

31. Saunders, T. R., Ross, D., Landau, G., & Poirier, J. G., (1989, January). The psychologist in court. Workshop presented at the Maryland Psychological Association, Private Practice Conference. Columbia, MD: University of Maryland.

32. Poirier, J. G. (1989, March). Contested custody and allegations of violence. Paper presented at the American Psychological Association, Divisions 29, 42, and 43 Mid - Winter Convention, Orlando, FL.

33. Saunders, T. R., Poirier, J. G., & Ferris, C. (1989, March). Forensic aspects of child abuse. Workshop presented at the American Psychological Association, Divisions 29, 42, and 43 Midwinter Convention, Orlando, FL.

34. Shapiro, D., Hughes, C. A., Poirier, J. G., & Bloch, R. (1989, June). The implications of the duty to warn. Workshop presented at the Maryland Psychological Association Convention, Columbia, MD.

35. Saunders, T. R., Gravitz, M. A., Poirier, J. G., & Solomon, A. O. (1989). *Child Custody Assessment*. Position paper prepared by the Maryland Psychological Association, Professional Guidelines Development Committee.

36. Saunders, T. R., Mason, R., Ferris, C., Marcus. B., Olson, J., & Poirier, J. G. (1990, January). Moot court: Criminal responsibility. Workshop presented at the Maryland Psychological Association Professional Practice Conference, Columbia, MD.

37. Poirier, J. G. (1990, March). Disputed custody and concerns of parental violence: Ethical considerations. Paper presented at the American Psychological Association, Divisions 29, 42, and 43 Midwinter Convention, Palm Springs, CA.

38. Poirier, J. G. (1991). Disputed custody and concerns of parental violence. *Psychotherapy in Private Practice*, 9, (3), 7-23.

39. Poirier, J. G. (1991, April). Considerations in the evaluation and treatment of sexually abused, hearing impaired children. Workshop resented at Maryland School for the Deaf, Mental Health Issues with Deaf Children and Adolescents Conference, Frederick, MD.

40. Poirier, J. G. (1991, May). Assessing the potential for violence in troubled families. Paper presented at the National Organization of Forensic Social Work, Eighth Annual Conference, Washington, DC.

41. Poirier, J. G. (1993, August). Domestic violence and the ethics of expert testimony. In A. Austria (Chair), Domestic violence and sexual harassment: ethical issues in expert testimony. Symposium presented at the annual convention of the American Psychological Association. Toronto, Ontario Canada.

42. Poirier, J. G. (1993, October). Juvenile sexual offending behavior: Dealing with competing interests and influences. Panel presentation, Maryland Association of Resources for Families and Youth, Conference entitled Sex Offending Behavior: Uncovering and Responding to Problems and Myths. Columbia, MD.

43. Poirier, J. G. (1993). The prescription privileges saga: Comment to Dr. Wright's legal justification. *The Independent Practitioner*, 13, (5), 197-199.

44. Poirier, J. G. (1994. April). Issues and current status of forensic clinical evaluations of child sexual abuse. Seminar presentation to Montgomery County, Maryland, Department of Social Services, Child Welfare Division.

45. Poirier, J. G. (1996). Violence in the family. In H. V. Hall (Ed.) *Lethal Violence 2000: A Source Book on Fatal Domestic. Acquaintance and Stranger Aggression* (pp. 259-292). Kamuela, HI. Pacific Institute for the Study of Conflict and Aggression.

46. Saunders, T. R., Gindes, M., Silver, R., & Poirier, J. G. (1997, March). Applications of science and practice in the courtroom: Integration of forensic and clinical expertise. Symposium presented at the American Psychological Association, Divisions 29, 42, & 43 Midwinter Convention, and St. Petersburg, FL.

47. Poirier, J. G. (1997). The value of ABPP Clinical Board Certification. *Academy of Clinical Psychology Bulletin. 3*, (2), 28-38.

48. Poirier, J. G. (1997, August). Ethical and legal considerations in the practice of family psychology. Workshop presentation. American Psychological Association, Division 43, Family Board Exam Preparation Workshop, Chicago, IL.

49. Saunders, R. T., Bloch, E. B., Poirier, J. G., & Walker, L. (1998, February). Child protection evaluations: Improving the status of abused children without sacrificing professional psychology. Symposium presented at the American I5sychological Association, Divisions 29, 42, & 43 Midwinter Convention, San Diego, CA.

50. Poirier, J. G. (1998, February). Mobilizing community resources for the identification and treatment of juvenile sex offenders. Paper presented at the American Psychological Association, Divisions 29, 42, & 43 Mid-Winter Convention, San Diego, CA.

51. Poirier, J. G. (1999a). Violent juvenile crime. In H. V. Hall & L. C. Whitaker (Eds.) *Collective Violence: Effective Strategies for Assessing and Interviewing in Fatal Group and Institutional Aggression* (pp.183-212). Boca Raton, FL: CRC Press.

52. Poirier, J. G. (1999b). Evaluation and Treatment of the Juvenile Sex Offender. American Psychological Association, Division 42, Practice Information Clearinghouse of Knowledge, Niche Guide.  Order information available at: <http://www.division42.org/MembersArea/PractDevelop/PICK42main.html>

53. Poirier, J. G. (1999c). The mental health/judicial interface: Taboo dynamics and collaboration strategies with the juvenile sex offender. In T. R. Saunders (Chair), *Professional Collaboration in Independent Practice.* Symposium presented at the Annual Meeting of the American Psychological Association. Boston, MA.

54. Hall, H.V. & Poirier, **J. G.** (2000). *Detecting malingering and deception: The revised forensic distortion analysis (FDA)* (2 Ed.). Boca Raton: CRC Press.

55. Poirier, J.G. (2000). Detection of malingering and deception (2nd Ed.): An overview. *Academy of Clinical Psychology Bulletin. 6*, (2), 15-16.

56. Poirier, J.G. & Cohen, H.M. (2001). The American Academy of Clinical Psychology (AC1inP) Website: A user introduction, description, and guide. *Academy of Clinical Psychology, 7*, (1), 16-18.

57. Poirier, J.G. & Levin, E. (January 2002) Confidentiality and Privileged Communication: Practice safeguards. Workshop presented at City of Rockville, Maryland, Department of Community Services, Rockville, Maryland.

58. Poirier, J.G. (April 2002). Mentally ill offenders: An imperative for interdisciplinary collaboration. Paper presented in a symposium at the National Academies of Practice and Interdisciplinary Health Care Team Conference, Arlington, V A.

59. Poirier, J.G. (27 February 2003) Deception and malingering: Coping strategies for the clinician. Invited presentation, University of Maryland School of Medicine, Department of Psychiatry Grand Rounds. Baltimore, Maryland.

60. Poirier, J. G. (2005). Evaluation and treatment of the juvenile sex offender. American Psychological Association, Division 42, Practice Information Clearinghouse of Knowledge, Niche Guide. Order information available at: <http://www.division42.org/MembersArea/PractDevelop/PICK42main.html>

61. Poirier, J. G. (2008). The juvenile sex offender. In H. V. Hall & J. Thompson (Eds.) *Forensic Psychology and Neuropsychology for Criminal and Civil Cases* (pp. 417-456). Boca Raton: CRC Press.

62. Poirier, J. G. (2008). Violence in the family: Including fatal outcome. In H. V. Hall & J. Thompson (Eds.) *Forensic Psychology and Neuropsychology for Criminal and Civil Cases* (pp. 169-205). Boca Raton: CRC Press.

63. Hall, H. V., Poirier, J. G. &, Thompson, J. (2008). Deception in criminal contexts. In H. V. Hall & J. Thompson (Eds.) *Forensic Psychology and Neuropsychology for Criminal and Civil Cases* (pp. 289-327). Boca Raton: CRC Press.

64. Hall, H. V., Poirier, J. G. &, Thompson, J. (2008). Detecting malingering and deception in forensic evaluations. In H. V. Hall & J. Thompson (Eds.) *Forensic Psychology and Neuropsychology for Criminal and Civil Cases* (pp. 93-130). Boca Raton: CRC Press.

65. Hall, H. V., Poirier, J. G. &, Thompson, J. (2008). Malingered pain and memory deficits in civil-forensic contexts. In H. V. Hall & J. Thompson (Eds.) *Forensic Psychology and Neuropsychology for Criminal and Civil Cases* (pp. 487-525). Boca Raton: CRC Press.

66. Hall, H. V., Poirier, J. G. &, Thompson, J. (In press). Detecting deception in neuropsychological cases. *Forensic Examiner*.

**Book Reviews:**

1. Poirier. J. G. (1988). [Review of Psychotherapists in Clinical Practice, Cognitive and Behavioral Perspectives]. *Psychotherapy in Private Practice, 6*, 125-126.

2. Poirier, J. G. (1988). [Review of The Clinician's Handbook, the Psychopathology of Adulthood and Late Adolescence]. *Psychotherapy in Private Practice, 6*, 93.

3. Poirier, J. G. (1988). [Review of Essentials of Neuropsychological Assessment]. *Psychotherapy in Private Practice, 6*, 226.

4. Poirier. J. G. (1991). [Review of Rituals in Families and Family Therapy]. *Psychotherapy in Private Practice, 9*, 174-176.

5. Poirier, J. G. (1992). [Review of Outpatient Treatment of Child Molesters]. *Psychotherapy in Private Practice, 11*, 122.

6. Poirier, J. G. (1995). [Review of How Psychotherapy Works: Process and Technique]. *Psychotherapy in Private Practice, 14*, 97-99.

7. Poirier, J. G. (1996). [Review of Assessing dangerousness: Violence by Sexual Offenders, Batterers and Child Abusers]. *Psychotherapy, 33* (1), 153-154.

---

CV – Rev. 1/08-d

# FILED UNDER SEAL



The Honorable Judge Thomas F. Hogan
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20530

*Re: Bill Dulany*

To Judge Hogan:

I've known Bill since 1996 when my wife and I joined St. James' Episcopal Church in Mt. Airy where the Dulany family are members. As a Jr. High School student Bill was in my Sunday School class. I saw Bill on a weekly basis at church until he graduated and left home to attend college. I know his family well.

Bill is a respectful, thoughtful and quiet person who knows how to apply himself with diligence. He has an easygoing manner and a good sense of humor. In college he applied himself and did very well. Over the years I gained an impression of Bill as a young man of good character from a close-knit family

Since Bill's arrest I've seen him on a weekly basis. We usually get together at my house and talk for an hour or two at a time. Although I am an experienced counseling therapist, I do not see Bill in that capacity; rather, I provide emotional support and spiritual guidance.

Bill has suffered greatly since his arrest: he lost his car, the company with whom he had very bright prospects asked him to resign, and his marriage is in trouble. Despite these setbacks, however, he has persevered in finding a new job by going through employment interviews and is now employed part-time. His arrest has greatly complicated this process and places him in a very stressful position since he does not know whether he will be incarcerated. He has faced up to his mistakes with honesty and courage.

I do not believe jail time could have a remedial effect on Bill. Instead, I believe it would cause irreparable harm. The burden of having served imprisonment will likely cripple his ability to find the kind of work he is capable of doing. More troubling, however, is my concern for the effect it would inevitably have on his character and self esteem.

Bill became enmeshed in behavior that needs remediation and I believe his long-term prospects will be best served by continuing what he has started since his arrest: ongoing counseling therapy, attending support group meetings, having the support and encouragement of his family and friends, and participation in the life of the Church. I am committed to providing support for Bill's recovery because I am convinced he recognizes the need for change and is willing to work toward it. Bill has not become hardended by his experiences and I am concerned that incarceration would have that effect. While his character remains malleable I want to help him learn from his mistakes and amend his life. I believe he has a good chance of doing so but fear incarceration would take that away.

EXHIBIT
E

Since his arrest I've seen evidence of Bill's determination to overcome the mistakes he has made and change his life. Despite the enormous stress he's under, Bill has not only worked to find and utilize competent helpers, he has also taken steps to deal with his employment difficulties and handle the uncertainty that looms in the future as his trial date approaches.

Bill is a fine young man who deserves the chance to remake his life. If I did not believe he has a sincere desire to overcome his mistakes I would not be willing to commit myself to provide ongoing guidance and support to him over the long term.

Sincerely yours,

Frederick B. Winston, MPA, MS

2600 Mullinix Mill Road
Mt. Airy, MD, 21771

Character Statement - William Dulany

This is something that I thought I would never have to do, write a character statement about Bill Dulany. If someone were to ask me before this whole thing happened, "Would I do anything for Bill?" I would have answered "Yes, I would absolutely do anything for him." Unfortunately this falls into that category, like it or not. Although I do have reservations about writing this because of the nature of the alleged incident, I still have to write a statement about the person I knew and loved. Bill and I went to elementary, middle, and high school together, although we didn't become close friends until our high school years. We hung out with the same group of friends, had many of the same classes together, and even worked at the same after school job. Bill was friendly, outgoing, and could always make you laugh. He was always a hard worker too, excelling both inside the classroom and out on the soccer field. He and I were so competitive with each other about who could get the highest grades, but in the end, we stood side by side as Valedictorian's of South Carroll High School. He and I also won the Senior Superlative for "Most Studious." I couldn't have been more proud of him. All that hard work and dedication paid off. I was both excited and relieved when I found out that we would be going to college together at University of Maryland. It was going to be great having one of my closest friends there with me since we would be away from home for the first time in our lives. Because of his 4.0 GPA, outstanding score on the SAT's, his athletic ability, and his participation in several school clubs and activities, he was asked to be a part of the Honors Program at Maryland. Even though we were in different dorms and were pursuing different majors, we still spoke daily, and we would always make it a point to eat dinner together. I think it was a great support system for us. He was very outgoing in college, had a lot of friends, and joined a fraternity. Even with these extra curricular activities, he was still able to focus on his studies, and gradate with honors. When I got married the summer after we graduated from college, it was extremely important that Bill attend the wedding. He was one of my best friends, and I wanted him there to celebrate my special day. Then when he and Sarah married in June 2007, my husband and I attended his wedding.

Bill and his family have had a lot on their plate the past few years. Just to name a few, his father donated a kidney to his little brother, his sister's boyfriend died last summer in an accidental drowning, not to mention the stress of planning his wedding, he and Sarah buying their first house, and he's been taking classes to work towards a master's degree.

I am still having a difficult time comprehending the incident that occurred for which he is being charged. This is not the person I grew up with or considered to be one of my closest friends. He obviously has a serious problem to face and overcome. I think counseling, therapy, and support groups would be very beneficial to him. Maybe there is a way to turn this awful incident into something positive by having him do community service and help others with this sort of problem. All I know is that Bill is a descent human being and is thought highly of by family, friends, and neighbors. I have never felt unsafe or uncomfortable around him, and have never felt that he was a threat to anyone. Thank you for your consideration.

Amanda R. Elder



**John Hamilton Easter**
**P.O. Box 172**
**Butler, MD 21023**

Judge Thomas F. Hogan
US District Court for the District of Columbia
333 Constitution Avenue, NW
Washington DC 20004

May 27, 2008

Dear Judge Hogan:

I am a very close friend of the Dulany family. I have known Bill's father for well over 40 years and spent much of my youth with him and the rest of his family. They are a second family to me. I have always enjoyed being a part of so many major events that have taken place over the years with the Dulanys. When you spend so much time with any group of people, you learn a lot about their values and morals. The reason I developed such a close relationship with the Dulany family was because I have always appreciated what they stand for.

As has been the ongoing tradition in this family, Bill's parents have centered their lives around those of their children. They have given all their time and effort to do what is best for them and to bring them up right. That sacrifice has paid off. William, his sister Katie and younger brother Brandon are good kids - all of them. They are respectful, honest and have a positive attitude.

Needless to say when I found out about the what Bill was involved in last December, I was shocked and terribly upset. Despite the time that has elapsed since I first learned of this, my disbelief has not faded at all. I am so sorry for what this has done to such an upstanding family and of course how this will drastically change Bill's entire future.

What bothers me the most is that I know Bill is a good person with a good heart. He obviously has a serious problem that everyone was unaware of. While I cannot help but feel angry about it at times, I have to look at the overall picture and know that he is now and will forever pay a large price for what he has done. I also have to take into account that he has not begun to deny any aspect of his wrongdoing. He is taking full responsibility for this and is going through the painful process of informing everyone in his circle about what he has done. Most importantly, he has been aggressively undergoing counseling for this problem.

I am writing because I am aware that guilt with this type of offense could mean time spent in prison. I truly hope that taking into consideration Bill's background and his character that a term of imprisonment could be avoided. At this point he understands the seriousness of what he has done. I do know that he is a good person though, and am certain that incarceration would only damage him. Honestly, I don't think Bill would survive being in that kind of



environment. He is certainly paying the price for what he has done now and this will undoubtedly affect the rest of his life. He is also getting a daily first hand reminder of how this has devastated his family. But from the actions he has taken since this has happened, I am confident that he is on the right track now. While incarceration is certainly necessary for some people, I'm afraid in Bill's case it will only steer him off the road that he is on now to repairing this problem.

Sincerely,

Hamilton Easter

The Honorable Thomas F. Hogan
Chief Judge, U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

May 27, 2008

Dear Judge Hogan,

I have known Bill Dulany since his father and I were Tiger Scout leaders together
when our sons were about seven years old. Our families have remained close
since that time. Our boys played little league together as well as taking karate
together for a number of years. When our sons graduated from high school my
contact with Bill became sporadic but I was able to get updates from his father on
how he was doing. *However, after Bill was arrested and entered his guilty plea,
he came to talk to me to explain what he had done. Bill accepted responsibility
for his actions and has never made any excuses for them. I know this was
incredibly difficult for Bill but he clearly wanted me to know about his problem.
While I was shocked and saddened by Bill's news, I gained a new level of
respect for him as he was open and frank about what he had done.*

I am a retired Captain from the Division of Corrections and for the last ten years
have managed a drug rehabilitation clinic. *I believe that this experience gives me
a unique perspective in writing this letter on Bill's behalf.* I am well aware of the
failings of human beings. I saw it when I worked in the state prison system as
well as now in the drug abuse field. *As I stated above,* I am shocked to learn of
Bill's current problems. I know *Bill and* his parents are devastated by the
circumstances that Bill finds himself in now. I also know they are good and
supportive parents who will continue to provide their son with love and do the
necessary things to help him. My personal concern is that having retired after
twenty years with the state prison system; I do not see the benefit of his serving a
prison term. *I strongly believe that* he needs continuing counseling on a long-
term basis, something that would not be available in prison on the intense level
needed to help Bill. He has accepted total responsibility for his actions and
wants to have a productive life. I see this as a plus as many of the people I have
come in contact with in my former job and also my current one want to place
blame on others or find some excuse for their actions. I do not get that feeling
from Bill, however this does not excuse his actions. He realizes what he did was
wrong and the difficult decision is what is best not only for Bill but society. I
strongly believe that for a first time offender under these circumstances the
benefit comes from closely monitored probation and long-term counseling. This
would allow him to start to rebuild his life by being gainfully employed as well a
being treated under supervision in the community where he lives.



*Thank you very much for taking the time to read my letter. I hope my perspective as a former part of the penal system helps you in making your decision.*

Sincerely,

Ron Abigill

5811 Corporal Jones Court
Mt. Airy, Maryland 21771

The Honorable Thomas F. Hogan
Chief Judge, U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

April 28, 2008

Dear Judge Hogan,

My heart is heavy as I write this reference letter for Bill Dulany. Having known the Dulany family since 1986, it is difficult to know why Bill made such a wrong decision. It is so out of character, based on my associations with him. Our families are members of the same community and parish church. I know Bill through my work at our church as well as being a family friend. I especially remember one evening when Bill and his younger sister visited my home. It was at that time when I introduced Bill to his first 'cup of tea' on our deck – warm with milk and sugar. He thought it was the best treat ever and introduced the tradition to his own family.

Bill was a faithful member of our church Sunday School program from pre-school through high school before going on to college. His willingness to volunteer in youth activities and church functions was always appreciated. Bill attended confirmation classes with other students and was confirmed into the faith in 1997. He served on the altar as a youth acolyte in a responsible and dedicated manner during his middle and high school years. Bill continues to be an active member of our faith community. I particularly remember Bill as a happy, cooperative boy. He got along well with his peers and was admired by adults. In an effort to save money for the church, Bill and his dad would regularly cut the grass in the churchyard. An elderly couple who lived next to the church would refresh them with water and provide a shaded area on their porch. This became a ritual and a deep friendship continued for years until the death of the couple.

The importance of being accountable for our actions has always been stressed. Bill is now realizing exactly what that means. He has admitted his wrongs and is seeking guidance. Does it take a village to raise children? Yes, I believe it does. With the support of Bill's loving family, close friends and his faith community, we pray that Bill will strive to move forward and continue to be accountable for his actions. I sincerely hope that you think of Bill's good qualities when deciding on an appropriate sentence for him. Bill knows that he has done something wrong and he certainly understands the gravity of his actions. When sentencing Bill, I ask that you consider a sentence that allows Bill to get the help he needs. With the proper help and the support of his faith, I sincerely believe that Bill will be able to get better and return to being the fine young adult that I have gotten to know through our church activities.

Sincerely,

*Joan B. Fader*

Joan B. Fader

EXHIBIT

I

June 3, 2008

Dear Judge Hogan,

My name is Kellan Webb. I have known Bill for over 12 year. We met our freshmen year in high school through mutual friends from the men's and women's soccer teams, of which we were both a part. Bill was always the shy, nice guy that everyone was friends with. As I got to know him better I realized that he also had a wonderful sense of humor and he was a very easy person to be around. We quickly became good friends and even went to homecoming together our sophomore year. I remember that the boutonnière that I bought Bill to wear was really large and he was wearing a silky type shirt, so the combination resulted in the boutonnière flopping over and pulling his shirt down, looking completely ridiculous. But Bill was too nice of a guy to take the boutonnière off. Even when I told him that it would be OK with me if he did so, he wore it the whole night. Bill has always been considerate in this way. When some female friends of out wanted to go see the cherry blossoms in college, but they didn't want to just go as a group of girls, he volunteered to go with them and they had a great time. Bill has always been the kind of person who is always around for his friends and isn't concerned about what other people think or say.

At this point I should explain that Bill and I also went to college together at the University of Maryland. Only a handful of people I was friends with from high school ended up going to Maryland, and I am so thankful that Bill was one of them because we became lifelong friends from the experience. Bill and I found out we were both accepted to the UMD honors program while we were camp counselors at Camp Hoshua our senior year in high school. Being a counselor was something we had both wanted to do ever since we attended the camp as sixth graders. Bill has a little brother named Brandon who was around the age of our campers at the time, so he knew what kinds of activities they would love and how to get along with them. He was definitely their favorite counselor that week, organizing plans with the other counselors to take them on hikes and snow tubing.

Having Bill at Maryland with me was great because we were both able to make new friends and combine everyone together into a great group of people that we hung out with for four years and are still friends with to this day. Several of us even lived together our senior year in college. I was glad to have Bill there as a friend and as a guy around the house for safety. Bill can be a jokester, but I honestly believe he would put himself in harms way to protect any of his friends or family.

Our junior year at Maryland, Bill went to visit out friend Sandy from High School where she was going to college. During the visit he met Sandy's cousin who was also attending school there. From the very start I could tell that Bill had met someone different. He visited "Sandy" several more times before he confessed to everyone that he was in love with her cousin Sara. This was no surprise to anyone because he had been acting distinctly un-Bill-like around Sara, taking her out wherever she wanted and even


EXHIBIT
J

buying new tires for her car to make sure she was safe when she couldn't afford them herself. Up until this point Bill had been someone who saved money and didn't spend a lot on himself. But when it came to Sara there was nothing he wouldn't do for her. I wasn't at all surprised when they announced their engagement shortly after Sara graduated from school.

Bill has also always been very protective and selfless when it comes to his family. His younger brother Brandon was born with very poorly functioning kidneys and Bill took it upon himself from a young age to offer one of his own kidneys to save Brandon's life when the time came. It was never a question of if, but when, and Bill was prepared to do that for his younger brother without even thinking about it. When Brandon needed the transplant about a year ago, Bill's father was able to give Brandon's one of his kidney's, but had that not been possible Bill would have stepped in, in a second, even though he and Sara were planning their wedding at the time.

Bill's younger sister Katie tragically lost her long-time boyfriend just a few months after Bill and Sara's wedding when he accidentally drowned. Despite any problems Bill was having in his own life at the time, he was there to support Katie and pull her up when she didn't have the strength to do it for herself. Just being there for her as someone to talk to and lean on has made a huge difference in her spirit.

The past several months since Bill's arrest have clearly been difficult for him. His close friends, myself included, did not know until recently what was going on. However, we could tell that something was wrong. In the middle of May Bill called our friend Julie and asked if we could meet him at his house in Frederick, MD to talk. I replied that that was fine and I met him later that afternoon. Prior to heading over to his house I asked Julie if she knew anything about what was going on because I was very worried about Bill and I wanted to be as mentally and emotionally prepared to talk to him as possible. Julie told me at that time that Sara had left him and that he was in some kind of legal trouble. I was shocked that Sara had left and completely perplexed as to what Bill (probably the most law abiding friend I have) could have possibly done to be in "legal trouble". None of what Julie had said made any sense to me. When I met Bill at his house Julie was running late so we chit-chatted and caught up a bit while we waited.

Bill asked me if I had spoken to Julie and I told him that I knew Sara had left and that he was in some sort of trouble. He admitted that both were true and that he had made a terrible mistake back in December and that ever since he and Sara had been living separately, her at the house in Frederick and he at his parent's house in Mt. Airy. I expressed confusion and disappointment in Sara for leaving and he replied that he couldn't blame her, considering what he had done. He expressed concern that they had grown further and further apart during the time that they hadn't been living together and I could see for the first time in months that he was no longer pretending to be OK around me; he was visibly upset and agonized over loosing her. In the course of talking he admitted that he had cheated on Sara and that despite everything he had done he had never meant to hurt her, but that he had felt out of control. Despite this he told me that he was still responsible for what had happened and that he had been the one who had ruined their perfect life together. He understood why she was having such a difficult time and

needed to leave. It was at this point that I first started to suspect that Bill was struggling with an addiction issue, but he hadn't spelled anything out yet because we were still waiting for Julie.

After hearing from Julie that she would still be a while longer, Bill and I got some food and brought it back to the house. While we were eating he started to explain some of his prior statements. He told me straight out that he was suffering from something that was considered an addiction. He told me that ever since high school he had been struggling with his self-esteem and that he had begun looking at pornography over the internet. As this continued through college, he began to take greater and greater risks related to his addiction until he actually began to start meeting people in person that he had met online. As if this wasn't shocking enough, he then told me that the encounters had always been with other men. Bill told me that he tried seeing a counselor back in college and that he thought he had gotten control over his compulsions, but that he had stopped being honest with her and slipped back into old habits. He commented that he had wanted to believe he was OK and didn't need help anymore, but that he was wrong and at the time he couldn't yet admit to himself and to others that he was sick.

It was about this time that Julie finally made it over to Bill's house and he told us both that part of his legal trouble was that he needed to wear an ankle monitor and be home (at his parent's house) by 10pm every night. He asked if we could come back to his parent's house to talk more and we both followed him to Mt. Airy. When we got there Bill told Julie everything that he had told me up until the part where he had previously sought help but was unable to admit how much of a problem he truly had. He then told Julie and me that back in December he had made a huge mistake when he agreed to meet-up with a man he had had a previous encounter with in addition to another male who was a 16 year old minor. This statement was clearly the most difficult part of the story for Bill to get out. His face was red and he looked exhausted. He couldn't look either one of us in the eye for more than a few seconds after that. I have never seen him look so ashamed and broken in all the time I have known him. Here was this confident, funny guy who now sat in front of me without a shred of dignity left in him. I wanted to cry seeing him like that, but he looked near it himself so I pulled myself together for his sake.

Bill told Julie and me that he had been incredibly lucky to be on a house arrest curfew for the past few months instead of in jail and how grateful he was for that. He told us that because of the arrest he had lost his car and his job and that he would have to register as a sex-offender for the next 10-25 years of his life. He also told us what he was originally charged with and that it had been reduced to "enticement of a minor", something else for which he was extremely lucky. At that time Julie and I asked him a lot of important questions about whether he was getting help and how he was doing with the stress of the situation. He told us that he was seeing a counselor and was going to meetings. He also told us that he had started talking to someone at his church and was attending bible study session on Sunday mornings in addition to the regular services he had always attended, just for "something extra". He tried to explain that while he realizes people would likely look at his situation and assume he was in denial about his lifestyle

choice, he always felt no emotional connection in the encounters and felt disgusting afterwards. In talking with his counselor he has come to understand that they were more a product of his self-hatred and need to create control over some aspect of his life. They had little to do with the people involved. He assured us that being confronted with the reality of his addiction and what he was doing, as well as loosing his wife, whom he still loves dearly, has completely removed his compulsion for unhealthy behaviors. He even told us that he was grateful for his arrest because he needed a wake-up call to how out of control his behavior had become and that things could have been much worse for Sara if they had had children. Throughout the entire conversation Bill kept coming back around to her. He is extremely disappointed in himself and sorry for what he has done. But more than anything he is sorry for how much he has hurt her and broken her trust. For that, I am not sure he will every forgive himself.

I have heard that an addict needs to hit bottom before they can truly begin the road to recovery. For Bill, loosing Sara and having to call his parents from jail that night in December was his bottom. Talking to him that night at his house and at his parent's house I could see in his eyes that he is starting over as a man. He has lost everything in his life that was important to him, his job, his wife and the life they had planned together. All he can do now is be honest with the people who still love him and hope that they can forgive him. From talking to Bill I know that he is changed from the experience of his arrest. He needed it to happen so he could turn the corner towards a new path in his life, one where he has treatment, the support of family and friends he is now being honest with, and God. I forgive him for what he has done and I love him in spite of it. I am so thankful that he was willing to be honest with me despite how difficult it was for him to admit his mistakes, because now I can help him throughout his recovery and be there to remind him that he has a bright future worth getting better for. My world is a better place with Bill in it, and I will do everything possible to support him and let him know how much he is loved by the people around him. I know that Bill's best chance for recovery and a new start at life is to be in treatment and have access to the people who care about him, something he won't have in prison. Bill is an intelligent, caring, trustworthy person who also happens to be sick and needs help. He is doing everything he can to get that help and learn to take care of himself and overcome his addiction. He has been struggling since such a young age with the personal issues that caused his addiction to manifest, that it is really only now that he has gotten the chance to talk to the people who can help him and make a start at a healthy lifestyle. Please give him a chance to prove that he can be successful. I have faith in him, and I pray that you will also.

Sincerely,

Kellan Webb

May 14, 2008

To Judge Hogan:

I met William Dulany approximately five ago when we were both students at the University of Maryland, College Park. I consider William a very dear friend who I have been able to depend on throughout the years. Despite moving apart geographically, we have been able to maintain a close friendship even after college. I was lucky to be a guest at William's wedding, where I was able to share in the happiest day of his life. Over the years, William has proven to be a loyal, kind, and honest person.

William was always there to offer sound advice when I was at a professional or personal crossroad. Because he was two years older than me, he had already experienced a lot of the confusion and anxiety that came with the decisions I was making regarding my professional future. He helped me by sharing his mistakes, and offering insight as someone who was already in the working world.

When my brother was diagnosed with cancer, William kept my spirits high by making sure I was kept busy with laughter and surrounded by close friends. Although some of my friends were scared to touch on the subject, William made sure to ask how my brother was doing, and how I was dealing with the whole situation, even after my brother was in remission. William also often talked about his faith, and how when he fell into difficult times, he looked to God for questions and strength. He encouraged me to do the same, which helped me through many hardships.

A few months ago, William sat me down and told me he had something to tell me. As apprehensive as I was, I knew that after all William had done for me, the least I could do was hear what was bothering him. He told me that he had done something he was very ashamed of, and proceeded to explain his situation.

I was shocked and appalled to hear what William had to say. The only thing crossing my mind was how it had to be some kind of a sick joke, because the William Dulany that I know would never engage in this kind of behavior. He assured me that it was not a joke, and that he was completely disgusted with himself. He told me he knew he has a major problem.

Just like William was there for me, I want to be there for him. I want to help him in any way possible, and that is why I am writing this letter. William is in no way a threat to society. He has realized that he has a problem and is eager to get help. Since his arrest, he has sought out professional help for his addiction by attending counseling sessions. He has been trying to find various inpatient treatment centers where he can devote one hundred percent of his time to dealing with his sex addiction and bettering himself for his family and friends.



I realize that William's remorse cannot fully compensate for the pain and suffering endured by the victims of the crimes and their families but I believe that helping William overcome his addiction is the only remedy for the situation. From what I have heard from people sentenced to prison, rehabilitation was unsuccessful. I think William would do much better in a rehab facility where he can hear stories directly from the mouths of the people who lived them, and how they went about getting better.

I have full confidence that with the right help, William can remain a contributing member of society. William is one of the most genuine people I know, and seeing him during this time has been very difficult. I have seen how upset he is that he has brought shame to himself, his family, and his friends. I know that he wants to stop hurting people and get help right away, and I hope the court makes a decision that will be conducive to William's rehabilitation.

Sincerely,

Narda Ipakchi

W. Bryant Dulany
4463 Old National Pike
Mt. Airy, MD  21771
Tel.  410-795-6613
Cell  410-596-4227


June 3, 2008


The Honorable Judge Thomas F. Hogan
United States District Court for the District of Columbia
333 Constitution Avenue NW
Washington DC 20530

Dear Judge Hogan:

      Thank you for taking time to read the letters about our son Bill from friends, family members and me. I greatly regret that Bill and our family deviated to this position. His mother and I were shocked to the core to learn of this tragic incident in Bill's life, a life that had been so positive.  Along with many other feelings we felt very bad to learn that unbeknownst to us Bill had this problem and had been trying to fix it for some time on his own with a counselor that he had lined up who accepted his health insurance coverage.  Most unfortunately Bill needed a better, more extensive program and his problem apparently overwhelmed him and caused the ruin of the life that he had worked hard to build by doing so many things properly:

- Hard working student:    High School valedictorian 2000.
  University of Maryland Business degree with honors 2004.
  University of Maryland Graduate courses while employed working toward MBA.

- Hard working athlete:    High School soccer team, all county award recognition.
  University of Maryland Club soccer team.

- Hard working employee:    Successful as marketing coordinator, promoted to marketing specialist at Plamondon Company, Frederick,Maryland during 3 years from 03/05 to 03/08 at which time he informed employer of his arrest in 12/07.
  Also always worked hard for employers since age 16, working while attending high school and college.

EXHIBIT

- **Church:** Attended through high school but not afterwards.
  Served as acolyte during teenage years.

- **Family:** Good relations with immediate family and all other relatives.

- **Friends:** Good relationships with friends from high school and college.

- **Wife:** Good relationship with wife, Sarah, whom he married in 07/07.

- **Homeowner:** Worked very hard restoring a home he purchased in 09/07 which
  was a foreclosure and which had extensive damage.

- **Good citizen:** Good behavior record throughout school years.

Bill has always been a great pleasure as a son. As our first child Bill has been a great joy and blessing for my wife and I. We are committed to helping him attain good psychological health and monitoring it to prevent any recurrence. We will continue to seek to help him get the best counseling possible. We are very grateful to the court system for this period of monitored supervision before sentencing which has allowed us the time to provide Bill with the counseling he needed and will of course continue to need to some extent for a long time. This time of opportunity has been a blessing and we are very grateful to the court system and the prosecutor.

I am serious when I say that although this is a shameful tragedy for Bill and our family, I can only be truly grateful to God and to law enforcement for the work it does and that it did here in revealing a terrible problem that Bill had, and that law enforcement brought this to light in a fabricated situation so that there was no actual victim. This arrest has enabled us to work to correct things before events were worse. Obviously what's done is done and now Bill with the support of us, his family, has to work extremely hard to continue to work to treat his psychological health. Also we have to closely monitor his mental health and behavior to ensure that he stays on track. It has been encouraging over the past five months to see Bill's honesty and commitment towards correcting himself. Since his arrest and learning of Bill's psychological problem, we have researched counseling for the best treatment. He has been engaged in extensive counseling and correction from many sources as listed in the counseling log including documentation, which is being provided to the court. The counseling log lists counseling and appointment dates for the many sources of counseling:

| | |
|---|---|
| Kevin Schick, M.A., LCPC,NCC, Director of Counseling | (on going) |
| Joseph Poirier, Ph.D., ABPP, Clinical Psychologist | (on going) |
| Dennis Carpenter, Psy. D. | (completed) |
| Blix Winston, Licensed Pastoral Counselor | (on going) |
| New Life Ministries 3 Day Sexual Integrity conference 02/08 | (on going - continuing to meet conference accountability contact) (on going - attend July conference depending on sentencing) |
| Sexaholics Anonymous | (on going) |
| St. James Church, Mt. Airy, Md. Sunday Service | (on going - attended all to date) |

It has been encouraging to see Bill's commitment in his wellness recovery program.

- He never misses any counseling opportunity unless there happens to be a conflict where a counselor schedules a session on the same night as a Sexaholics Anonymous meeting, and then he is unable to attend that Sexaholics Anonymous meeting. He called me during the sexual integrity 3 day conference he attended in Sterling, Virginia telling me how much he appreciated being able to go to the conference, how very helpful he found it, and also telling us of some materials his mother and I could read to help his younger brother from ever growing confused and getting off track like Bill himself had.

- Regarding his faith, as mentioned he has missed no church services since the arrest, he has met privately with our minister, he reads the Bible every night, and he mentioned a few weeks ago that he wanted to join a Bible study group. Unfortunately currently there is no Bible study group at our church, and meetings at other churches that we have researched so far are at times that conflict with our church service.

- Regarding his marriage, Bill has chosen to be honest with his wife in sharing things with her about his struggles and progress during this recovery period at the risk of further increasing the possibility of losing his marriage because as he said he learned from his counseling program that total honesty with his wife was key for overall success.

- Regarding monitoring, Bill informed us about a internet security program that he learned about from his New Life Ministries conference contact which blocks sites and which will enable his mother and I to have access to a tracking system which lists all sites that Bill visits. We then purchased this service and found it reassuring that Bill brought this to our attention for the purpose of monitoring him.

- Regarding employment Bill has sought to be honest. As mentioned he notified his employer of 3 years about his arrest and then after considering things for a week the employer despite having a very good relationship with Bill, determined that in light of the arrest to terminate employment. Bill has also shared his arrest in interviewing for new employment. Consequently, after a couple interviews, one potential new employer then spoke with Bill's attorney and then indicated that they would wait until after the June 9th sentencing before making a decision on hiring Bill.

The arrest was a blessing additionally because it revealed the psychological problem that tormented Bill before its wrongful lifestyle destroyed his physical health and the health of his wife. Following the arrest Bill and Sarah, his wife, were tested in 01/08 for the AIDS virus and were found to be clean. This was of course an extreme relief, first that Sarah was healthy, and secondly that Bill was healthy. Bill's health is also very important to us for the sake of his younger brother because within the next 13 to 18 years we are hoping that Bill will qualify to be a kidney donor for his brother, Brandon. Brandon is now 14 years of age. Brandon has had kidney troubles since birth with the disease, Focal Glomerulo Sclerosis. We were told by the doctors at Johns Hopkins when Brandon was the age of 3 that his kidneys would fail due to this disease and that he would need a transplant to survive. Both Bill and his sister Katie offered to donate one of their kidneys to Brandon. As it turned out I was blessed as being compatible and healthy and in 7/07 a successful transplant was made from me to Brandon. The doctors have told us that the transplanted kidney will hopefully last 15 to 20 years. At that point Brandon will need another kidney transplant.

Generally, for kidney transplantation, the donor age high limit is 60 years old. At the time when Brandon is likely to require another kidney his mother, Karen, now 51, would be in her mid sixties and too old to qualify as a donor. Our thought has been that Bill or Katie, now 23, would be the donor at that time. Katie is a school teacher in Chestertown, Maryland and is healthy and would hopefully qualify as a donor. Katie was treated for a kidney infection herself at the age of 8, but there has been no reoccurrence.

After Brandon's kidney trouble was discovered, as a precaution his siblings, Bill and Katie had their kidney function tested when they were about the ages of 15 and 13 and the results were normal. Later in 2005, in preparation for a transplant in 2006, my wife and I were given blood tests to check compatibility. The test checks to see how many of the 6 antigens the potential donor has in common with the recipient. The higher the number of antigens that the donor and recipient have in common the more likely the transplanted kidney will not be rejected. Bill and Katie were not tested, but siblings we understand are highly likely to have enough antigens in common. If Brandon gets the maximum expected lifespan from the kidney he received in 07/06, and then receives his second kidney from Bill, then age early 40's, and then later receives his third kidney from Katie, then age mid fifties, the 3 family transplants could possibly carry Brandon to age 70, before he would then need another transplant. We are looking for Brandon to get the maximum expected lifespan from his kidney transplant and not to need a transplant

sooner, although the reality is that this is a possibility. Also, I do not recall the medical terminology, but for some reason due to Brandon's blood type not being as common as others and due to some reactions in his body in responding to the foreign object (the transplanted kidney), being put in his body, the next kidney transplant will have to be an even closer match to qualify. Finding a close match can be difficult, so it is important that Bill and Katie remain healthy for Brandon's benefit, so illness does not disqualify them as candidates. Certainly Bill's current circumstances had the potential of putting himself and his wife at risk for some disease. Such a result would have rendered Bill unable to qualify as a potential life saving kidney donor for Brandon. Again, the arrest while Bill was still healthy was a great blessing. Because of Brandon, I was also greatly relieved at Bill's initial hearing when he was allowed to be released on monitored supervision instead of being incarcerated. Justly or unjustly, I feared exposure to possible disease in a prison setting. I don't have any facts to support this fear, but the likelihood of Bill contracting some disease that would render him an ineffective donor for Brandon greatly increases with incarceration. Naturally, for this reason, I ask that by the mercy of the court that Bill receive a sentence that does not include incarceration, for the benefit of Bill, his wife Sarah, and for sake of Brandon's future health.

We are also asking the court to spare Bill incarceration so that he can continue the wellness recovery plan that he has been engaged in for the past 5 months, meeting with Kevin Schick, Joseph Poirier, Blix Winston, New Life Ministries Conferences, New Life Ministries Conference accountability contact, Sexaholics Anonymous Meetings, and Sunday services at St. James Church. We think that this would be a more extensive counseling program then he would receive in prison and create the best possibility for correcting his psychological health. We are aware of the importance of monitoring his progress and being vigilant in watching for any sign of regression. I was told by Bill's attorney that a person that returns to court again with this offense repeated will be crucified. We will not forget that.

Thank you very much Your Honor for taking time to consider our requests.

Sincerely,

Bryant Dulany

Your Honor,

As a mother, I am truly upset and disappointed about the crime Bill has committed (enticement of a minor). I was surprised, also, to find out that he struggled with this problem and tried to get counseling on his own. I don't want to excuse or make light of the situation. I know Bill needs therapy, more intense and more appropriate  than what he tried to get on his own.

Since July of 2006 Bill has been under a great amount of stress that I believe impacted some of his decisions. In July, his father donated a kidney to his younger brother, who was 12 at the time. In August, he himself had knee surgery. Then in the fall his father had another surgery for hernia repair and in November his brother had a nephrectomy to remove diseased kidneys. In the winter of 2007-2008, melanoma was found on Bill's hand and he had surgery. He was told that every 3-6 months he should have more moles tested, which he is still doing. Also during the fall/winter of 2007-2008, he became engaged and was planning a wedding as well as taking graduate classes. He continued to take classes and look for a home for after the wedding. Two weeks after his June 30,2008 wedding we went to Ohio to have a reception for him and his new wife with family there. The first night there Bill went swimming with his sister's boyfriend of three years. Her boyfriend drowned while swimming from a dock to a small island a short distance away. I know Bill carries guilt for this, also.

Bill has never intentionally hurt someone. He knows right from wrong and knows he did something against the law. Since his arrest, Bill has been able to find counseling that deals more specifically with his problem. This time no one was hurt directly. I hope there hasn't been a direct victim at any other time and that getting this help was in time. I just would like the result of this to be something that will have him pay for his mistakes, but also allow him to receive the therapy he tried to get on his own ,so that nothing like this ever happens again. He needs to gain a better understanding of himself, his thoughts and actions and ways to deal with stressful situations.

Sincerely,

Karen Dulany

Karen Dulany



EXHIBIT

M

tabbies®

Monday, June 02, 2008

Judge Thomas F. Hogan
United States Courthouse for the District of Columbia
333 Constitution Avenue, NW
Washington DC 20530

Dear Judge Hogan,

I am Bill's brother Brandon. Right now I am fourteen years old and am in 9th grade. I've grown up with Bill for all of those 14 years, and during them, he has been a good influence to me. During the times I was angry or frustrated at something, he helped me think of something fair that made everyone happy. When I was sad he'd cheer me up by doing something with me that I liked, such as playing a game or watching a movie. He always tried hard to keep everyone in the family calm and in peace with each other. I remember when he went to college I missed him a lot. During the middle of his first year, I told him this and he decided we should see each other more often. So he would come to our house, or invite me up there to a soccer game or another activity so we could see each other more often. I know he wanted to be in my life and I'm lucky he was because he provided me with a great big brother experience. This was the same when he moved to his apartment. He tried hard to do things with the family and get everyone together. I always think of Bill as the peace maker in the family.

On July 17, 2006, I had a kidney transplant. This was a very, very emotional and stressful event for my whole family due to the fact my father was the donor. I remember I was so scared before my operation, and nearly cried every time I thought about the operating room. Bill saw this. When he did he started asking me why I was afraid, and that I shouldn't be due to the excellent care John's Hopkins Hospital would provide. Well, I still was nervous but he didn't give up. He continued to give me courage telling me I could do it. He did this for the rest of the family too. I watched him keep the family's moral up, and hearts happy. It had to be hard on him watching his dad and little brother go into surgery, but somehow he remained confident and when the rest of the family saw this, they too gained confidence. In recovery, it was me and my mom in the hospital room, while my dad was downstairs recovering. Since my mom was with me, and my dad was alone, Bill decided my dad needed company too. He stayed with him so my dad would have someone to talk to, and so he knew some one was there to help. This just shows how much Bill cares. He always wanted, and still does want, the family to have peace with one another, to have hope, and to have love.

I understand what he did and realize the seriousness of it. But I also see what he is doing to get help for his actions. He is going to many counselors and meetings for help to point him in the right direction and prevent him from making any more mistakes. Not only does he go to church every Sunday, I see him getting involved in our church more and more. He wants to join a bible study group and is trying to follow a good path from now on. He wants to get better.



I'm trying to show you that I need him in my life. It would crush me to know my brother was in jail, especially since he doesn't belong there. He's not a dangerous person, just a person who made a mistake. I know he needs help and I know he will do everything he can to get it and get better. Please let my brother stay with our family so that we can continue to live a good life.

Thank you for your consideration,

Brandon Dulany

May 28, 2008

Dear Judge Hogan:

My name is Kathryn Dulany. I am Bill Dulany's younger sister. I have known Bill for 23 years and have grown up living with him for 17 years (until we both went off to college). Growing up having an older brother was a blessing. Bill has done nothing but wished me the best in everything I do, and has always been protective over me.

Over the years, Bill has helped me greatly in many ways. While we were growing up, I always wanted to be like my older brother and play soccer just like him. Almost every summer for 5 or 6 years we went to a soccer camp together. I was always scared about situations like that, but knowing that my brother was going to be there too, seemed to make that fear disappear. Aside from Athletics, my brother has also inspired me Academically. Bill is a very intelligent individual, and growing up with him was always a competition for me. He was always receiving straight A's or close to it. I was always trying very hard to keep up with him to achieve those same marks. Bill helped me to aspire to that goal of being successful in my studies in grade school and continued to encourage me while in college. Bill has also helped me tremendously in some very tough and trying times. This past July, 2007, while visiting with my family in Ohio, my boyfriend, Jaron, of 3 years (soon to be fiancé) died in a drowning accident. Bill was with Jaron when the accident happened.

It is absolutely without a doubt the most heartbreaking and tragic experience that I have been through. Bill too has taken this event to heart and has been continuously trying to keep my spirits up by telling me to keep on living my life as Jaron would want me too. When it all first happened, Bill was blaming himself for the accident and saying that it should have been him instead, after seeing how badly I was hurting.

But as I've told him time and time again and as have others, this accident was no ones fault, there was nothing any of us could have done, and no one would ever wish it upon anyone. Bill has been there for me since that day whenever I need a brother and a friend to talk to, at anytime at all. I know he will continue to be there for me, and I need him to be there for me because I can't have that same feeling of losing someone so special again.

I know what Bill has done is very wrong and being someone who works with children, I don't agree with what he has done in anyway what so ever.

However, he is my brother, and always will be my brother, and I hope and I am asking that you be compassionate for my family, my brother, and myself. We are all disappointed and very sad about what has happened, and it is another awful time for my family to be going through. I hope that you can see that even though Bill has disappointed our family with this mistake, he still truly is a good person and a caring person, and our family needs him in our lives, everyday.


EXHIBIT
0

I believe that Bill is not a dangerous person, but I know that he does need to get help and needs to continue the counseling that he is receiving already. I know that it would be a lot easier for Bill to get the help and counseling that he needs if he were out of prison rather than in. He is being punished already by what he has done, and I know that he is very ashamed of what he is done. I just hope that you can see that Bill needs to get help so that he can get better, and I know that would be absolutely possible if he were not in prison.

Thank you for your time and understanding for my family in this matter and I hope that you can help my brother, Bill, get the help that he needs.

Sincerely,

*Kathryn A. Dulany*

Kathryn A. Dulany

May 14, 2008

Judge Hogan,

My name is Robert Sefcik. I am Bill Dulany's uncle on his mother's side. Bill called me and told me what he had done. Having known Bill all his life, I was very upset with what I heard and very disappointed in Bill. What he described is totally out of character for him from my perspective.

Bill was raised in a Christian family who care deeply about him. Bill was born three months after my oldest child, Jenny, was born. Jenny has cerebral palsy and has been confined to a wheelchair all her life. She is non-ambulatory and essentially non-verbal, only able to say a few words. Throughout his life, Bill has always showed tremendous patience and understanding with his cousin. He took time from every visit to sit down with Jenny and talk to her, spending quality time that she thoroughly enjoyed. At his wedding reception in 2007, he took about thirty minutes to sit down and talk with her to help her feel included in the activities. He has had a positive influence on my other four children as well providing a good role model with respect to education and sports. He is not a bad person. I believe Bill is a good person who obviously has made a terrible mistake that we will regret for the rest of his life.

In talking to Bill, I know he is embarrassed and very sorry about what he did. I don't believe this is only because he got caught. He has lost his job and possibly his marriage to a wonderful girl. I believe he has a problem that needs to be dealt with. His family, including myself, will be there to help him work through his problems. I am requesting that you consider that he has a problem that contributed to his actions when you sentence him. We would all like to see him get the help he needs as soon as possible.

Thank you for your consideration of my letter in this case.

Robert Sefcik
Uncle to Bill Dulany


EXHIBIT
P

Linda M. Koltas
17410 Snyder Rd
Chagrin Falls, Ohio 44023

May 27, 2008

Judge Thomas F. Hogan
US District Court for the District of Columbia
333 Constitution Avenue NW
Washington DC 20001

Dear Judge Hogan:

I'm writing on behalf of William Michael Dulany. Bill is not only my nephew but he is also my godson. Obviously, I've known Bill his entire life. I've watched him grow from a very sweet, happy child into a very responsible and hardworking adult. He comes from a strong, close knit family. Bill excelled in school and at his job. Although Bill's family lives in Maryland, I would see him multiple times a year for holidays and family reunions and vacations.

Throughout his life, Bill has consistently exemplified hard work and dedication to his family and friends through his actions. He was always an excellent student and is a role model for his younger siblings. He is always around to help out his family whenever needed. Although Bill lives in Maryland, he always finds time to visit his family in Ohio especially his grandparents. At a time when a lot of younger adults would find any excuse to stay home with friends rather than travel hundreds of miles to visit family, Bill is always willing, when able, to take the trip to visit his family. Anytime someone needs help, Bill is always there to lend a helping hand. He always participates in family activities such as playing card games and volleyball when we are all together for our family reunions. My oldest son thinks the world of Bill. Bill always takes the time to play with Sam and shows a lot of patience with a rambunctious 3 year old. Bill will hang Sam upside down, "like a monkey", and Sam would be giggling hysterically. Thanks to Bill, Sam always wants to be hung upside down. Bill is a very strong individual. We had a very tragic event happen this past year whereas during our family reunion, my nieces (Bill's sister) boyfriend, Jaron, drowned. Bill was there to help his sister and family through it all. He was out in the water, along with his father and his uncle, trying to find Jaron. He searched tirelessly until professional help arrived. This had a significant impact on Bill and his family.

Recently, I've become aware of a problem that Bill has that has brought him to this situation. Bill and I have spoken about his problem. I did not know that he was struggling with this type of addiction in his life. He recognizes that he has problems that he has to deal with and that he has made a mistake. He is taking full responsibility of his actions and is seeking the professional treatment that he needs in order to control his addiction. I ask that you please be sympathetic when reviewing the case against Bill. Since his family is now aware of his problems, he has the strong support structure needed to guide him through this situation and keep focused on treatment and getting the help that he needs. Prison isn't the place to put Bill. He has already begun attending treatment programs and building a support structure through these programs that would be diverted if he is sent to prison. As I mentioned previously, Bill comes from a close family. I believe that this strong support structure will help him get the continued help that he needs and I have no doubt that he will stick with his treatment programs.

EXHIBIT

Q

In closing, I hope that you will take into account with the sentencing that Bill is really an exceptional man who has fallen and is taking the steps necessary to turn his life around through treatment and family support.  He needs the ability to continue his treatment programs and grow his support structure through those programs.

Sincerely,

Linda M Koltas

*Linda M Koltas*

Sarah Dulany
6706 Manorly Court
Frederick, MD 21703
May 31, 2007


Dear Judge Thomas Hogan:

My name is Sarah Dulany and I am the wife of Bill Dulany. I am twenty-three years old and have many plans for my future. I graduated in 2006 from Bridgewater College in Virginia with a B.S. in Communication Studies. I am currently a foster parent recruiter for MENTOR Maryland, a therapeutic foster care agency. I work hard to recruit and license foster parents for children that need homes. I was just recently accepted into the teaching program at McDaniel College where I will receive my initial teaching certification as well as my masters degree. My classes begin this summer, and I could not be more excited to become an elementary school teacher. After reading a little bit about me, you can understand why this charge against Bill has completed and utterly devastated me. All of my life goals are centered on the protection of children.

My cousin Sandy first introduced me to Bill in 2004. Sandy and I attended the same college, and Sandy and Bill had grown up together and were very good friends. Bill came to help Sandy move out of college, and we all hung out that weekend. From that point on, Bill and I talked every night on the phone and saw each other when we could. I was living on campus in Bridgewater, Virginia, and Bill had just graduated from college and was living in Mt. Airy, Maryland. I knew from the moment I met Bill that there was something special about him. He was caring, fun, sensitive, funny, smart, and successful; everything a girl wants in a guy. To say I fell in love with him quickly would be an understatement. I told my roommate after the second time we hung out that I knew Bill was "the one". I am a smart girl who never rushes into things and who likes to have a plan. Even now when I look back it seems crazy that I would have told my roommate something like that after just the second time of meeting Bill.

Bill made it easy for me to love him. When Bill and I first met, my mom had just been admitted to a hospital in Delaware where she remained for months. Being at school in Virginia, I was distraught that I could not be with her all of the time. I am the eldest of four children, and felt it was my responsibility to take care of her. Bill would book a hotel and pick me and my two sisters and my brother up and take us to visit her on the weekends. He would bring my mom flowers and activities to do in the hospital. Bill would not only visit with us, but then he would have something fun planned to do afterwards so that none of us would be too sad. The love and thoughtfulness he showed toward my family and me those first few months was phenomenal.

Bill and I had a long distance relationship for two years while I was in college, but never once did one of us want to give up. Bill made it effortless for me. He never complained about having to drive to see me every weekend because I refused to miss out


EXHIBIT
R

of all of the fun senior-year activities. He would show up in the middle of the week just because he missed me. If I was having a bad day, Bill would show up with flowers and make me dinner and then drive back at five in the morning so he could get to work on time. He would come only for a few hours, but would think it was worth it just to see me. Bill always made me feel like I was most beautiful woman in the world.

As it is with most relationships you get to know your significant others friends and family. My family and friends immediately fell in love with Bill. He treated me well, was respectful, understanding, and a guy that everybody just wants to be around. I was so nervous about first meeting Bill's family, considering the first impression is the most important. I met them around Christmastime of 2004 and remember thinking how lucky Bill was to have these amazing people in his life. I knew from his interactions with his parents and his siblings that this was something I wanted to be a part of. Bill has grown up with such great role models. His parents are two of the most supportive and loving parents I have ever met and Bill is very lucky to have them. The same can be said about his friends. Bill has had some of the same friends since elementary and middle school and he cherishes those friendships. As we get older it is harder to spend time with friends because of busy schedules. Bill always took it upon himself to set up get-togethers because he knows the important of having great friends in your life. Because of these amazing relationships and friendships, Bill has been able to create an incredible support system.

When I graduated college, Bill and I moved into an apartment together. I can remember feeling so blessed that I had found the person I wanted to spend the rest of my life with so young. It was not hard for us to get adjusted to living together; like everything else in our relationship, it just came easily. Bill and I would bicker like most couples, but in the end we would end up laughing together. I loved that about us. I have never felt so comfortable, loved, or happy with anyone else. Bill made me feel safe and I never took that for granted. Before we got engaged, Bill came to me and told me that he had had some sexual issues in the past. He told me about his sexual addiction and how he had been going to see a counselor. He was very open about everything and at the time I didn't take it as seriously as I probably should have. I didn't worry about what he had told me because I trusted Bill and trusted that he was getting help for that problem.

On August 24, 2006, in the middle of the Baltimore Inner Harbor at midnight, Bill asked me to marry him. It was perfect. I said yes, thinking without a doubt that he is the person that I am supposed to spend the rest of my life with. Bill knew I wanted a fairy tale wedding, but at the time we did not have a lot of money. Bill assured me that he would give me the wedding of my dreams. He got a second job, as did I, and we worked for almost a year to save up the money that would let me be Cinderella for only one night. Bill never complained about having to work to give me the wedding I wanted. I really was the luckiest girl in the world. On June 30, 2007, as I was waiting in my wedding dress to get married, my mom brought me a card and flowers from Bill. The card said he couldn't wait to see me at the alter. I have never felt so sure about anything in my whole life. When I walked down the aisle, all I could see was Bill. He had the biggest smile on his face and tears running down his cheeks. I can't explain to you how I felt that day because to put it into words would not do it justice. Let me just say that I had absolutely no doubts about the man I was marrying.

Everything after that was a whirlwind of events, some good and some horrible. We celebrated our wedding with a honeymoon to Punta Cana. We believed that life couldn't have been better. A week after we returned home, we went to Ohio where the rest of Bill's family resides to have a second wedding reception. While there, Bill and his sister's boyfriend, Jaron, went swimming in the lake. It was getting dark and Jaron started to call for help. Before we knew what was going on, Jaron had gone under and it took lifeguards and officers two hours to find him in the water. Jaron ended up passing away that night and Bill and I will forever be changed because of it. Bill had been in the water with Jaron and blamed himself for what happened. Needless to say, Bill had a lot of survivor's guilt. Why did Jaron die and not him? Why couldn't he save him? After this incident, life was really tough. We went from being a happily married couple to a couple that had just gone through a very traumatic experience very early on in our marriage. Neither one of us knew how to help each other. A few months later life eventually began to get back to normal, and we bought a house and began to put all of our effort into that. I remember being so proud at how far we had come. We could overcome even the worse of situations and be better people and a better couple for it. Bill and I fell into a routine of work during the week and seeing friends and family on the weekends. December rolled around and I was so excited about spending our first Christmas together, but all of that changed in the blink of an eye.

My whole life changed on December 20, 2007. I got a call from Bill saying he had been arrested. I thought it was a joke because there is nothing in the world that Bill could possibly have been arrested for. When I found out what it was, I felt sick and my head would not stop spinning. This is not happening, this is not My Bill. My Bill would never, ever do anything like that. I know you probably hear this from every wife you have heard from… "not my husband, he wouldn't hurt a fly", or "my husband would never have done a thing like that". But this is the truth. How could the person who I outlined in the above paragraphs possibly set out to deliberately do something to ruin our relationship? I am an honest person and believe in doing the right thing. I truly believe in my heart that Bill is a good person. He is a person that recognized he had a problem and took the initiative to do something about it. He tried seeing a counselor to help himself, but was not aware he needed a more specialized therapist for his issues. Since being arrested, Bill has been introduced to resources that will help him with his sexual addiction. He is going to two counselors both specializing in sexual addiction as well as twelve step groups two days a week. Bill is aware he made a mistake and is completely sorry for it and is trying to do things to better himself. He has asked for forgiveness from me and I have given it to him. This might seem crazy given the nature of the crime he has committed. He broke our wedding vows and all of the trust that we had formed between us the past few years. To say I wasn't devastated or angry or repulsed with Bill would be a lie. I am all of these things, but another thing I am is grateful. Bill and I are grateful that he was caught. Because Bill was caught, he was able to stop living a lie and get the help and support he needs from professionals, his family, and his friends. I am so grateful that this has happened, no matter how much it hurts.

It is so hard to describe to you in a few paragraphs who Bill is as a person. I hope I am a good enough writer that I could help you understand a little better the Bill that I know instead of the Bill that you all know just as a case number on a piece of paper. I am asking you to please recognize that Bill has a real addiction, something he can control

given the right help. Given the nature of his addiction, I honestly do not believe that jail would be the best place for him. I think that Bill needs treatment, not incarceration. Please, I am asking you, give him another chance.

Sincerely,

*Sarah Dulany*